**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

TERRINA A. BROOKS                    :
13 N. Beaumont Avenue
Catonsville, Maryland 21228          :

Plaintiff,                           :

v.                                   :   Case No. _____

UNITED PARCEL SERVICE, INC.          :
55 Glenlake Parkway, NE
Atlanta, Georgia 30328                   :

    Defendant.                       :

...oooOooo...

## COMPLAINT

NOW COMES Plaintiff Terrina Brooks, by and through her attorneys, Andrew M. Dansicker, D. H. Andreas Lundstedt, and the Law Office of Andrew M. Dansicker, LLC, and hereby files this Complaint against Defendant United Parcel Service for gender and racial discrimination and retaliation under Title VII and Section 1981, and in support thereof states the following:

## THE PARTIES

1.      Plaintiff Terrina A. Brooks, who is currently employed by UPS, resides in Catonsville, Maryland, and is a female African-American.

2.      Defendant United Parcel Service ("UPS"), an Georgia corporation which maintains its corporate headquarters in Atlanta, Georgia, employs more than five-hundred thousand employees globally and is one of the largest package delivery and supply chain management operations in the world.

## JURISDICTION AND VENUE

3.     Subject matter jurisdiction is proper in this Court pursuant to 29 U.S.C. § 621 et. seq. as the case arises under federal law, Title VII of the Civil Rights Act and Section 1981, and personal jurisdiction is also proper in this Court because Defendant transacts extensive business in Maryland and the events giving rise to this litigation took place in Maryland.

4.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in the District of Maryland, Northern Division.

## FACTS

### The Start Of Ms. Brooks' UPS Career – On The Fast Track To Success
#### (1987-1999)

5.     Ms. Brooks began working for UPS in February 1987, and during the past thirty-three (33) years, she has consistently received strong work performance evaluations and numerous awards for her outstanding performance.  In fact, Ms. Brooks has never been written up or put on a performance improvement plan at any time.  At all relevant times, her job performance was at a level that met and/or exceeded UPS's expectations and requirements.

6.     In early 1987, Ms. Brooks, who had recently graduated high school and enrolled at Bowie State University in Maryland, met with a UPS corporate recruiter on campus, applied for a position and was hired by UPS as a part-time car washer, responsible for scrubbing, washing, fueling and cleaning package delivery vehicles nightly as UPS's Burtonsville, Maryland facility, which was the hub for the Metro DC District.

7.     By June 1990, after graduating college, Ms. Brooks was promoted to the position of Package Car Delivery Driver in the Package Operations division of UPS.  At that time, experience as a driver was a prerequisite for a promotion to the supervisory level, and Ms.

Brooks was excited to gain valuable experience as a driver and eventually be promoted into a supervisor position.

8.      In August 1991, Ms. Brooks was featured on the cover of the Metro DC District's corporate magazine, "The Big Idea", for being one of top performing drivers for generating sales leads after less than a year in the position.

9.      In June 1994, Ms. Brooks was promoted to the position of On Road Package Car Supervisor for the Uptown Center, and in October 1995, she was assigned to the position of Account Executive.  The following year, in 1996, Ms. Brooks was assigned to the position of On Road Supervisor at the College Park Center.

10.     In September 1998, Ms. Brooks was promoted to the position of Business Manager in charge of UPS's College Park Center – a major achievement for an African-American female, as there were very few African-American or female Business Managers at that time – in fact, Ms. Brooks was only the first or second African-American female ever promoted by UPS to the position of Business Manager in the Metro DC District.

11.     Ms. Brooks' excitement and enthusiasm for her promotion ended on the very first day of her new job, when she entered the building and arrived at her office to see a crowd of people laughing and the word "Nigger" written on the side of a cabinet in her new office.  Ms. Brooks pretended that nothing happened, but that was the first of numerous racist, sexist, disrespectful, hostile actions that were taken towards her by drivers, supervisors and managers who wanted to make it clear that an African-American, female Business Manager was not welcome at UPS.

12.     Ms. Brooks repeatedly complained to her Division Manager, Burt Herring, a Caucasian Male, but Mr. Herring refused to take any action and repeatedly participated in the

harassment.  In fact, Mr. Herring stated that he had his "own opinions" about people of a different race and did not feel that she was qualified for the job.  During the next several months, he did not invite her out to drinks with the other managers, and he repeatedly isolated her and refused to acknowledge her achievements and success in the position – even when Ms. Brooks was winning awards because of her excellent performance.

13.     Ms. Brooks was so scared that her coworkers and managers would continue to sabotage her work, that she began sleeping in her office floor to make sure that nobody entered her operations while she was not present.

14.     In late 1998, Ms. Brooks learned that a fellow manager, Jim Adkins, had been making racial slurs and had stated, "the only way I can get promoted is if I become a black woman."  Ms. Brooks complained yet again to Mr. Herring, and he assured her that he would take action, but nothing changed.

15.     Consequently, in late December 1998, Ms. Brooks filed a complaint with Gina Haesloop, a UPS Human Resources representative, regarding the hostile environment and inappropriate comments and conduct.  Shortly thereafter, in January 1999, Mr. Herring met with Ms. Brooks and told her that he had reviewed the rules of professional conduct with her coworkers, and they had stated that they were "just playing."  He was later terminated for falsely documenting that Ms. Brooks was at various drinking outings when, in fact, she had not attended any such outings.

16.     Shortly thereafter, Ms. Brooks met with Marvin Stewart, UPS Employee Relations Manager, who asked her if she was going to file an EEOC charge or wanted a monetary settlement.  Ms. Brooks told him that she just wanted an equal opportunity to succeed and asked to be reassigned.

17.     In June 1999, Ms. Brooks was reassigned to the position of Sales Operations

Manager – the second highest sales management position in the Metro DC District, reporting

directly to the Director of Sales.  At that point, Ms. Brooks was one of two African-American

female sales managers out of more than five thousand UPS employees in the Metro DC District.

### Ms. Brooks Is Groomed To Be UPS's First African-American, Female Division Manager In The Metro DC District And Is An Outstanding Performer (1999-2010)

18.     Two months later, in August 1999, Ms. Brooks was informed by Region Business

Development Manager David Ward that UPS was taking steps to remedy the lack of female and

African-American Division level candidates for promotions, and that each department was

charged with preparing a list of minority and female candidates that would be ready for

promotion to the Division level within five years.  Ms. Brooks was told that her name was on the

promotion list as a "Ready Now" candidate – the only "Ready Now" African-American, female

candidate in the Metro DC District.  However, to be promoted to a Director of Sales position,

Ms. Brooks needed experience as an Area Sales Manager.

19.     Consequently, on January 1, 2000, Ms. Brooks was reassigned to the position of

Area Sales Manager, and during the next several years, she took on various roles, including

oversight of legal accounts, university accounts and embassy accounts.  Her new manager, Tom

Dames, told her that they were preparing Ms. Brooks for a promotion to the Division Manager

level within three to five years.

20.     During the next seven years, Ms. Brooks became one of the top Area Sales

Managers within UPS – in 2000, she won Best Overall Performance; in 2002, she won Best

Performing Sales Manager; in 2003, she won Best Performing Sales Manager, with an

effectiveness rating of 122%; and in 2004, she won Top Sales Manager, Outstanding

Performance, with an effectiveness rating of 113%.

21.    In 2005, Ms. Brooks attended the East Region Sales Excellence Award Ceremony in Philadelphia where she was recognized as the "Ready Now" candidate for the Metro DC District.  She was also honored by Arnold "Arnie" Wellman, former President of Global Public Affairs for UPS (and a former U.S. Congressman), for her excellent performance and contributions to the Metro DC District and was presented with a Sales Excellence Award, Top Performance, with an outstanding effectiveness rating of 132%.

22.    In or about 2006, Ms. Brooks received an "outstanding" annual performance rating, with an effectiveness rating of 113%, and was honored at a dinner with UPS CEO Mike Askew and District Manager Sonia Schmidthuber who presented her with a stone replica of the White House for her outstanding performance as the top sales performer in the Metro DC District.

23.    In or about January 2007, Ms. Brooks met with Michael Tannian, UPS Director of Sales, and Joseph Tringale, UPS District Manager, and was told that she was being groomed as Package Operations Division Manager.  They explained that since she had already served as a Business Manager, Sales Manager and Area Sales Manager, she needed experience as a Preload Manager to be qualified to be promoted to the position of Division Manager.

24.    Consequently, Ms. Brooks was assigned to the position of Preload Manager and was assigned to the Burtonsville Preload, one of the toughest assignments in the Metro DC District, supervising more than one-hundred fifty (150) full and part time employees. so that she would meet the final major prerequisite for becoming a Package Division Manager with UPS.

25.    On August 1, 2007, after only six months as Preload Manager, Ms. Brooks was reassigned back to an Area Sales Manager position by Mr. Tringale to try to "clean up" an

underperforming territory run by Matt Bracken, a Caucasian male, that was only performing at 70%.  Within a few months, Ms. Brooks had improved the territory to over 100% performance.  Mr. Bracken was later given an opportunity to advance as an Enterprise Account Manager, even though his performance was well below Ms. Brooks' job performance.

26.     On August 28, 2007, Ms. Brooks was named Chair of Women's Leadership Development for the Metro DC District as a further part of her preparation for a Division Manager position.

27.     On October 9, 2007, Ms. Brooks attended a Sales Leadership Conference in Louisville, Kentucky, where she met with Mr. Trujillo, former UPS Vice President Sales Operations, who met with her as the Metro DC District's "Ready Now" candidate and assured her that she would most likely be appointed to the next vacant Director of Sales position.

28.     In or about May 2008, Ms. Brooks was assigned as the Enterprise Account Executive Sales Manager in charge of the big box stores, such as Macy's, Best Buy, Bed Bath and Beyond.  Once again, she significantly outperformed and outpaced her peers.

29.     Later that year, she was named a World of Champions winner for her excellent performance and service.

30.     In 2009, Ms. Brooks was recognized as the #2 Best Overall Sales Manager within the East Region of UPS and was named a World of Champions winner for the second consecutive year for outstanding performance and service.

### UPS Is Reorganized And Ms. Brooks Is Promoted To Enterprise Account Manager
### (2010-2011)

31.     Beginning in 2010, UPS began undergoing a structural transformation consolidating Regions and Districts.  During the next few months, the Metro DC District merged with the Atlantic and Metro Philadelphia Districts to become the Chesapeake District – a new district encompassing more than fifteen thousand employees.   Thomas White was named the Managing Director of Sales for the Chesapeake District, and Sheldon Allen, who reported to Mr. White, was named one of two Director of Sales for the Chesapeake District.  Ms. Brooks was one of nine Sales Managers who reported to Mr. Allen on the South Side of the District.  Joe Olejniczak was in charge of the North Side of the District.

32.     In January 2010, because of her extensive experience and excellent performance in sales, operations and enterprise and government accounts, Ms. Brooks was specially assigned an additional task in addition to her role as Strategic Account Sales Manager – she was placed in charge of implementing the newly-obtained GSA contract worth more than $100,000,000 – the largest account in UPS history.

33.     In June 2010, the newly appointed Mr. Allen asked Ms. Brooks to meet him for lunch in downtown Baltimore.  At the lunch, he asked her to come to work for him "cleaning up" an underperforming territory.  He explained that he wanted to "stack the deck" with the best performers and had heard that she was the best performer in her Region.  Ms. Brooks explained to Mr. Allen that she has been on the "Ready Now" list since 1999 – more than ten years – and did not want to be effectively held back yet again, but ultimately Ms. Brooks had no choice but to agree to his request and, on August 1, 2010, Ms. Brooks was reassigned from her position as a Strategic Account Sales Manager back to her previous position as an Area Sales Manager

position to "clean up" another underperforming territory.

34.     Incredibly, the Caucasian Sales Manager who she replaced, Kevin Fox, who had been underperforming in his territory, was promoted to her previous position as Strategic Account Sales Manager.

35.     In December 2010, Mr. Allen went on short term disability for a month, and Ms. Brooks was chosen to serve as the acting Director of Sales for the Chesapeake District.  In that position, she was required to perform all of Mr. Allen's job duties, including managing the sales planning process, assisting newly promoted managers through the sales planning process and managing her own group of employees.

36.     Ms. Brooks continued her outstanding job performance during 2010 – she was ranked as one of the top Strategic Account Sales Managers within UPS.

### Ms. Brooks Raises Concerns About Her Failure To Be Promoted By UPS And Is Subjected To Blatant Retaliation By Mr. Allen (2011-12)

37.     During 2011, Ms. Brooks was repeatedly recognized for her excellent job performance; however, Ms. Brooks was concerned that she was being overlooked again and had not been promoted to a Director of Sales position, and on August 24, 2011, Ms. Brooks had a discussion with Myron Williams, UPS East Region Manager (Mr. White's manager and Ms. Brooks' former manager and long-time mentor), about her frustration with her career development and her concern about gender and racial discrimination and the lack of advancement opportunities for female African-American sales managers.  He asked her to follow up with him with an email outlining her concerns, and she sent him a long, detailed email setting forth her qualifications and concerns about the fact that she had not been promoted and had, in fact, been effectively pigeonholed in the Area Sales Manager position.

38.     Once again, Ms. Brooks' numbers for 2011 were excellent – she was named a Best Overall Performer with a 100% rating for volume, a 102% rating for revenue, and a 117% rating for freight, leading her to named a World of Champions winner for the third time – an incredible achievement within UPS.

39.     During 2010 and 2011, while Ms. Brooks was being pigeonholed in the Area Sales Manager position to improve the poor performance of another Sales Manager, four (4) Caucasian male Sales Managers were provided opportunities for advancement in the Enterprise and Government Sales Groups – Matt Bracken (whose territory had previously been cleaned up by Ms. Brooks after he underperformed), Dave Schuler, Rosko Roskowinski and Kevin Fox (who had taken the Strategic Account Manager position previously held by Ms. Brooks).

40.     During this time, Ms. Brooks was told by Mr. Allen and Mr. White that she was "one of the most experienced and strongest" Sales Managers and therefore she was "too valuable" as a Sales Manager to be promoted.

41.     In January 2012, the final numbers for 2011 were posted, and Ms. Brooks was the top performing Sales Manager in the Chesapeake District – in fact, she was the only Sales Manager to hit all of her sales targets, including 100% Volume, 101% Revenue, 101% RPP and 12.3% growth in freight volume.

42.     At this point, after twenty-five (25) years working for UPS, there could be no argument that Ms. Brooks was the top performing Sales Manager in the Chesapeake District and one of the top performing Sales Managers across the country.

43.     In addition, during her first twenty-five years at UPS, she improved herself by advancing her education – she obtained a Master's Degree in Non-Profit Management and PhD in Organizational Leadership, making her one of the most educated and talented Sales Managers

working for UPS (especially considering her rare set of cross-functional experience across the spectrum of operations, sales, enterprise and government groups, which should have made her stand out from her similarly-situated peers).

44.     Shortly thereafter, on January 5, 2012, Mr. Allen met with Ms. Brooks at a team strategy meeting for all Sales Managers in Philadelphia and told her that she was the "Ready Now" candidate for the Chesapeake District and would be meeting with the various Vice Presidents of Sales in an upcoming meeting in DC.

45.     On January 12, 2012, Ms. Brooks received a letter from Mr. White congratulating her for her excellent job performance during 2011 and stating that her efforts "had not gone unnoticed" by UPS management.

46.     On January 25, 2012, Ms. Brooks met in Washington, D.C. with Gerard Gibbons, UPS President of Sales, and Kate Gutman, UPS Vice President of Sales, and made a presentation as the "Ready Now" candidate for a Director of Sales position.

47.     On January 30, 2012, Jon Weed, an African-American employee working as a Senior Account Manager for Ms. Brooks and Mr. Allen, announced that he was resigning because of Mr. Allen's failure to promote him during the past several years.  When Ms. Brooks told Mr. Allen that Mr. Weed was resigning, Mr. Allen yelled and screamed at Ms. Brooks, blaming her for causing Mr. Weed to resign, and Mr. Allen used racial slurs regarding Mr. Weed – comments that Ms. Brooks found extremely offensive and inappropriate.

48.     Later that same day, Ms. Brooks contemplated resigning, but chose to continue fighting for recognition and a deserved promotion.  Shortly thereafter, Mr. Allen informed Ms. Brooks that he would be accompanying her on customer visits the next day to observe her job performance – something he had never done since he had become her manager nearly two years

earlier.

49.     That evening, Ms. Brooks called Mr. Williams to inform him that she was thinking about resigning because of the disrespect and verbal abuse that she was subjected by Mr. Allen as well as the lack of advancement opportunities – at this point, she had been working for UPS for twenty-five years and had been a "Ready Now" candidate for thirteen years, but she still had not been promoted to a Director of Sales position.  Mr. Williams encouraged her to be patient and assured her that he would investigate her allegations.  He also told her that there was an opening for an Enterprise Director position that would be a promotion for her, and he assured her that he would look into the situation.

50.     The next day, on January 31, 2012, Mr. Allen accompanied Ms. Brooks in her own vehicle to make customer visits and proceeded to interrogate her about her discussion the previous evening with Mr. Williams.  He demanded that she tell him exactly what was said, and he began criticizing various aspects of her job performance – complaints that had never been voiced prior to her complaints to Mr. Williams about the lack of opportunities for African-American, female employees under Mr. Allen.

51.     That evening, Ms. Brooks called Mr. Williams again to update him about the harassment and retaliation she had been subjected to by Mr. Allen during her customer visits, and she explained that she was deeply concerned that Mr. Allen was going to "black-ball" her as retaliation for her complaints to Mr. Williams.  She also told Mr. Williams once again that there were no management opportunities for females in the Chesapeake District under Mr. Allen.  Mr. Williams acknowledged speaking to Mr. Allen about their discussion the previous day, and he encouraged her to be patient.

52.     Shortly thereafter – on two separate occasions – Mr. Allen created new "makeshift" performance reviews (that were not given to the other Sales Managers on the North Side as he claimed) and gave Ms. Brooks negative performance reviews – the first direct evidence of retaliation by UPS.  The performance reviews did not comply with UPS guidelines and were clearly intended to punish and intimidate Ms. Brooks for voicing her concerns about discrimination to Mr. Williams.  Mr. Allen told Ms. Brooks that all of his managers were receiving the "makeshift" performance review, when in fact, Ms. Brooks was the only manager who received the "makeshift" performance review.

53.     During that time, Ms. Brooks also applied for the Enterprise Director position that Mr. Williams had suggested that she apply for when they talked on January 30, 2012.

54.     On February 17, 2012, after a training session in Philadelphia, Mr. Allen and Mr. White wanted to have a talk with Ms. Brooks, and during the private discussion, they raised various areas where they said that Ms. Brooks needed to show improvement – despite the fact that her job performance during 2011, by every objective measure, was exemplary.  They also tried to convince her not to apply for the Enterprise Director position stating that she would not want to work for the "white boys" because they wouldn't do anything for her.  At the end of the discussion, Mr. White asked her if she understood where she needed to improve, and Ms. Brooks told him that the entire "coaching" performed by Mr. Allen was a complete fabrication and blatant retaliation for her decision to file a complaint with Mr. Williams about Mr. Allen.

55.     On February 18, 2012, Ms. Brooks went on short-term disability for foot surgery.

56.     On February 22, 2012, Ms. Brooks learned that the Enterprise Director position had been filled before she was even invited to interview for the position.  When she contacted Kama Chavis, who was the hiring manager in charge of the requisition, she was told that Mr.

Allen had not contacted her to support Ms. Brooks, and she learned that the Caucasian male candidate who was chosen for the position, Stewart Reynolds, had only been employed by UPS for seven years, was less experienced, less educated and less qualified than Ms. Brooks, and never even applied for the job.

57.     Ms. Brooks made several phone calls and sent several emails to Mr. Allen asking for an explanation as to why Mr. Reynolds was promoted, rather than her, but Mr. Allen never responded to Ms. Brooks.

58.     Ms. Brooks later learned that Mr. Allen had rated her as a "minimal performer" which blocked her from receiving the promotion.

59.     In April 2012, Mr. Allen continued his retaliation against Ms. Brooks by giving her the lowest performance rating that she had ever received and not awarding her a merit bonus or annual raise, despite the fact that her sales numbers during 2011 were excellent.  This was the first time in her entire career that she did not receive an annual raise.

60.     In fact, all of the other managers who reported to Mr. Allen, including Judy Mattingly, Brett Kammeier, Kevin Fox and Matt Smith, were informed during their salary review that they would be receiving raises.  Mr. Allen did not conduct a salary review meeting with Ms. Brooks and did not give her a raise, even though, by any objective measure, she clearly outperformed each similarly-situated Caucasian manager reporting to Mr. Allen.

61.     Shortly thereafter, Ms. Brooks reported Mr. Allen's discriminatory and retaliatory conduct to UPS through the Business Compliance and Ethics Questionnaire (BECQ), and she was contacted by Christopher Robins, UPS Compliance and Ethics, who suggested she report the allegations to Human Resources.  She never heard back from Mr. Robins about her allegations.

62.     In May 2012, Ms. Brooks earned her Doctorate degree.  Mr. Allen's reaction was

14

to tell Ms. Brooks that "UPS does not recognize PhD's and the degree would have no bearing on her ability to advance within UPS."

63.     On May 13, 2012, Ms. Brooks reported Mr. Allen's discriminatory and retaliatory conduct to David Quinn, Director of Human Resources for the Chesapeake District.  He requested that Ms. Brooks provide him with a summary of her allegations, and several days later, on May 31, 2012, she sent him a twenty-page detailed summary of her allegations.

64.     In August 2012, Ms. Brooks returned to work from her short-term disability leave.  Shortly thereafter, Ms. Brooks met with Mr. Quinn to discuss her discrimination and retaliation allegations.  Mr. Quinn refused Ms. Brooks' request to transfer to a different district and told her that he would meet with her and Mr. Allen to address her concerns.

65.     On September 12, 2012, Ms. Brooks met with Mr. Quinn and Mr. Allen to discuss her allegations and concerns about Mr. Allen's mistreatment of her.  Mr. Quinn, however, did not bring up any of her allegations or concerns; rather, he stated that the discussion would be about Ms. Brooks' career aspirations.  After the meeting, when Ms. Brooks asked him why he had not raised any of her allegations or concerns, Mr. Quinn stated that Mr. Allen "seems like a really nice guy."  When Ms. Brooks expressed her frustration, Mr. Quinn walked away without answering her questions.

66.     On October 5, 2012, Ms. Brooks learned on a conference call with her peers that Downtown Locker Room ("DTLR"), a two-million dollar annual account she had secured for UPS, was reassigned to George Donnelly, a Caucasian male Sales Manager in Pennsylvania.

67.     On October 11, 2012, Ms. Brooks learned that Mr. Allen had been secretly meeting with employees who reported to her in an effort to find negative information about Ms. Brooks that could be used to discipline her.

15

**Ms. Brooks Files An EEOC Charge Against UPS For Discrimination And Retaliation,
And Mr. Allen's Discriminatory Conduct And Retaliation Escalates
(2012-13)**

68.     As a result of the increasing amount of retaliation that she was being subjected to

by Mr. Allen, on or about October 16, 2012, Ms. Brooks filed a Charge of Discrimination with

the Equal Employment Opportunity Commission ("EEOC"), Charge No. 531-2012-01950 (the

"2012 EEOC Charge") setting forth racial and gender discrimination and retaliation claims.

69.     On October 26, 2012, within ten days of the date that Ms. Brooks filed the 2012

EEOC Charge, Mr. Allen retaliated against her by removing her from the DTLR account, in

direct violation of UPS rules.  A few months later, the Chesapeake District posted the successful

acquisition of the DTLR account on the UPS website, falsely praising Mr. Donnelly for

obtaining the account – Ms. Brooks was not even mentioned or given any credit for the deal,

even though she had secured the new customer.  Several of Ms. Brooks' peers and subordinates

expressed their incredulity that Mr. Allen had so blatantly fabricated the story about how the

DTLR account was obtained for UPS.

70.     On November 16, 2012, in yet another retaliatory action, Mr. Allen ordered Ms.

Brooks to demote her top performer, Carole Crump, for no apparent reason.

71.     On November 28, 2012, Mr. Allen visited Ms. Allen's facility in Landover and

began interrogating Ms. Brooks' employees by asking them questions about her and her job

performance – he had never previously done this during the nearly three years that she reported

to him, nor had he even visited her facility.

72.     Several of Ms. Brooks' employees, including Damian Walls and Anthony

Murray, came to her after being interrogated by Mr. Allen and expressed their discomfort with

Mr. Allen's actions and requested that she report him to UPS Human Resources.

73.     On December 12, 2012, Mr. Allen announced that he would be rotating all of the Sales Managers reporting to him, and he would be reassigning Ms. Brooks to the worst territory and the worst performing employees on the south side of the Chesapeake District (the heavily African-American Waldorf territory).  All of her most profitable accounts were taken away from her and reassigned to Caucasian Sales Managers, and she was reassigned numerous declining accounts.  Effectively, Ms. Brooks was being removed from the top performing territory and reassigned to the lowest performing territory.  This was clearly an effort by Mr. Allen to cause Ms. Brooks' numbers to decline so that he could eventually justify her demotion and/or termination.

74.     On December 24, 2012, Ms. Brooks was invited to a "career discussion" with Mr. Allen.  At the meeting, Mr. Allen was blunt – "Your career has been put on hold.  You will not be promoted or transferred.  Because of your complaint to the EEOC, Rosemary Turner, the District Manager, does not trust you, so you cannot be promoted."

75.     On January 1, 2013, all of Ms. Brooks' peers were given reassignments by Mr. Allen except for Ms. Brooks.

76.     On January 8, 2013, Ms. Brooks met with Rosemary Turner in Philadelphia to file a complaint about Mr. Allen's discriminatory and retaliatory conduct.  Ms. Turner denied telling Mr. Allen that Ms. Brooks' career was on hold or that she did not trust Ms. Brooks.  Ms. Brooks spent nearly an hour telling Ms. Turner about the discriminatory and retaliatory actions that she had been subjected to by Mr. Allen.  Ms. Turner listened but took no action and did not investigate or make any effort to address her complaints.

77.     Later that day, while she was driving home from Philadelphia, Ms. Brooks received a phone call from one of her employees, Damian Walls, who told her that he was

17

frustrated with the lack of promotional opportunities for African-American employees.  He also told her that while she was on short term disability, Mr. Allen had questioned him about Ms. Brooks, asking him questions about her job performance and personal management style and trying to get him to make negative comments.  Mr. Walls said that he believed that because he refused to provide negative information to Mr. Allen about Ms. Brooks, he was not being considered for an upcoming promotion.

78.     Later that month, Mr. Allen promoted Justin Seay, a Caucasian supervisor, to the Senior Account Executive position instead of Mr. Walls, even though Mr. Walls was a higher performer and was better qualified for the position.  Ms. Brooks had recommended Mr. Walls for the position, but Mr. Allen disregarded her recommendation without even discussing the matter with her.  Mr. Allen would routinely discuss promotion decisions with the Caucasian Sales Managers before reaching a decision, and he typically would support the recommendations of the Caucasian Sales Managers.  This was yet another way for Mr. Allen to undermine Ms. Brooks as further retaliation against her.

79.     Later that same day, Ms. Brooks visited two of the largest (multi-million dollar) accounts that she had been reassigned to in the Waldorf territory, Tasco and Recorded Books.  In a meeting with one of those accounts, Tasco, Ms. Brooks was told that the company was going out of business and would not need any further services from UPS.  The Tasco representative was surprised that Ms. Brooks did not know this, as he stated he had previously informed Judy Mattingly, the UPS Sales Manager who Ms. Brooks replaced, that Tasco would no longer need any services from UPS.

80.     On January 10, 2013, Mr. Allen requested that Ms. Brooks meet with him at the Landover facility with two of her direct reports, Mr. Seay and Ms. Crump.  At the meeting, he

reassigned several declining account from Ms. Mattingly to Mr. Seay and Ms. Crump – this continuing pattern of assigning declining accounts to Ms. Brooks and her direct reports was another form of retaliation by Mr. Allen, as it was intended to ensure that their performance numbers would decline in the future.

81.     On January 11, 2013, as part of the annual Quality Performance Rating practice, Ms. Brooks was required to select six peers to rate their performance.  Mr. Allen instructed Ms. Brooks to change her selections, and he ordered her to remove all of the African-American peers that she had selected and to select only Caucasian peers.

82.     Ms. Brooks complained once again to the Regional Director, Barry Kastner, about the fact that Mr. Donnelly had improperly been assigned the DTLR account, and ultimately, Ms. Brooks and Ms. Crump were given credit for the account in their 2013 numbers after it was determined that Mr. Allen had broken UPS rules and improperly reassigned the DTLR account to Mr. Donnelly.

83.     On January 23, 2013, Mr. Allen reassigned a declining account to Ms. Brooks from David Nettle, a Caucasian Sales Manager.  The account had a $19,000 goodwill credit, which should have stayed with Mr. Nettle, but instead was  which would negatively impact Ms. Brooks' January numbers.

84.     On March 12, 2013, Mr. Seay notified Ms. Brooks that he had filed a formal complaint with UPS on the employee hotline regarding the discriminatory conduct and retaliation he believed that he was being subjected to by Mr. Allen.  Later, Mr. Seay was allowed to transfer to a different District, and the allegations against Mr. Allen were never investigated.

85.     On May 17, 2013, despite all of Mr. Allen's efforts to sabotage her job performance, as set forth above, Ms. Brooks was rated as 107% effective – the highest rating of

any Sales Manager in the Chesapeake District.  Mr. Allen called Ms. Brooks to his office to discuss her performance and told her that he was rating her as a "Strong Performer" as a result of her high numbers, but that he was removing her as the "Ready Now" candidate from the Chesapeake District and demoting her three levels to "Rotation 3-5 Years" – without any explanation or justification.

86.     Ms. Brooks was devastated by this retaliatory demotion – at this point, she had been a top performer for UPS for more than thirty-five years, winning numerous awards and receiving countless accolades, and had been the "Ready Now" candidate from the Metro DC District and Chesapeake District since 1999 – more than thirteen years!  During that time, Ms. Brooks had excelled at every required position and continued to be the top rated Sales Manager in the District.

87.     In June 2013, Mr. Brooks complained to Kevin Garvey, a Chesapeake District Human Resources Manager, and Kevin Dilibero, the Regional Human Resources Manager, about the discriminatory and retaliatory treatment that she had been subjected to by Mr. Allen.  Neither Mr. Dilibero nor Mr. Garvey took any steps to investigate her allegations or to remedy the discrimination or retaliation reported by Ms. Brooks.

88.     On June 28, 2013, after receiving no response from Mr. Dilibero or Mr. Garvey, Ms. Brooks escalated her discrimination and retaliation allegations to John McDevitt, UPS Senior Vice President of Human Resources and Labor Relations – the highest ranking Human Resources employee within UPS – and Tom Hooper, UPS Vice President of Human Resources, who reported to Mr. McDevitt.  Ms. Brooks explained the entire history of discrimination and retaliation and described the hostile environment she had been working in since filing an EEOC charge.  Ms. Brooks never heard back from Mr. McDevitt or Mr. Hooper.

### UPS Retaliates By Passing Over Ms. Brooks
### For Director of Sales For Chesapeake District
### (2013)

89.     In July 2013, Mr. Allen was reassigned to New York, and Ms. Brooks reported to Matt Ford, a Caucasian male, who replaced Mr. Allen as Director of Sales for the Chesapeake District, South.

90.     At no point was Ms. Brooks offered the opportunity to interview for the Director of Sales position, nor was she considered for the job.

91.     On October 22, 2013, Thomas White, Managing Director of Sales for the Chesapeake Region, announced on a conference call with all of Ms. Brooks' peers that he was taking a large, two million dollar account from Ms. Brooks and reassigning it to Mr. Donnelly. This was Ms. Brooks largest new account in 2013, and Mr. White's decision to arbitrarily reassign the account to Mr. Donnelly was a direct violation of UPS rules. It was also embarrassing and humiliating for Ms. Brooks, who had worked hard for months trying to land the account.

92.     In December 2013, Ms. Brooks had a meeting with Jill Schubert, the UPS District Manager, Barry Kastner, UPS Region Manager, and Kevin Quinn, UPS HR District Manager, to express her continuing concerns about discrimination and retaliation by Mr. White (and to review her previous issues with Mr. Allen). Mr. Kastner was disrespectful towards Ms. Brooks from the beginning of the meeting, criticizing her appearance and challenging her leadership skills. She told her that no matter how much education she had, she was not a leader at UPS. He also told her that no matter how good her numbers were, they were not going to recommend her for a promotion or restore her to the "Ready Now" status. He also told her that she was not a good leader because she had failed to prevent her direct reports from filing complaints about

management. Once again, Ms. Brooks was embarrassed and humiliated for no reason except retaliation for her previous complaints of discrimination and retaliation.

**Ms. Brooks Is Top Performing Sales Manager**
**In Chesapeake District - And Is Rewarded With A Demotion**
**2014**

93.     In April 2014, Mr. Ford had a career development session with Ms. Brooks, and she received a (rare) five percent annual salary increase and an excellent evaluation, based on the fact that she was the top performing Area Sales Manager in the Chesapeake District.  In fact, she was the only Sales Manager in the Chesapeake District to be rated in the top six percent of Sales Managers in the United States.  Mr. Ford also increased Ms. Brooks' promotional status from "Rotation 3-5 Years" to "Rotation 1-2 Years."  Mr. Ford told Ms. Brooks that her performance has been "stellar" and that "big changes" would be coming later in the year.  This was the first time in years that Ms. Brooks felt that she was being fairly treated by UPS management.

94.     On June 6, 2014, Mr. Ford told Ms. Brooks that Joe Olejniczak, the new Managing Director of the Chesapeake District, had downgraded Ms. Brooks once again to "Rotation 3-5 Years" because one of her accounts had failed to meet projections – the customer, GSM Nation, had reduced business and thus reduced need for UPS services.  The customer's failure to meet projections had nothing to do with Ms. Brooks.

95.     Ms. Brooks pointed out to Mr. Olejniczak that she was the top Area Sales Manager performer during the previous year, that she had obtained the largest account, and that four of her employees were top performers in the entire country, but Mr. Olejniczak continued to state that performance was not everything, and that she was not a strong leader and was not able to manage one-hundred people.  When Ms. Brooks pointed out that she had successfully managed hundreds of employees in previous positions, Mr. Olejniczak did not respond except to

further make false accusations and baseless characterizations about Ms. Brooks.

96.     During Fall 2014, Ms. Brooks was pregnant and, by early October, she was more than seven months pregnant and experiencing various medical issues, including difficulty walking, swelling in her feet and legs, and carpal tunnel syndrome.  On October 3, 2014, Mr. Ford notified Ms. Brooks that he wanted to go on a coaching ride with her – his first coaching ride with her since he became her manager more than a year earlier.

97.     Ms. Brooks explained that she was more than 26 weeks pregnant and had difficulty walking, but he insisted that she spend two days with him driving and walking around DC visiting customers.  Ms. Brooks had difficulty walking and had to use the bathroom every fifteen minutes, but at no point did Mr. Ford ask if she wanted to stop or if she needed any accommodations.

98.     Incredulously, a few weeks later, on November 19, 2014, Mr. Ford notified Ms. Brooks that he wanted to go on a three-day coaching ride with her in late November.  Ms. Brooks responded that she was 32 weeks pregnant and was using a wheelchair as she could not walk or climb stairs.  Mr. Ford, however, continued to insist that they go on another coaching ride, until on November 29, 2014, Ms. Brooks went into premature labor and gave birth.

99.     Ms. Brooks was on pregnancy leave until mid-January 2015.

## Ms. Brooks Is Repeatedly Denied Promotions And Lateral Transfers 2014-16

100.     In 2014, UPS promoted Jeff Briggs, a Caucasian male, into the position of Director of Sales for the Chesapeake District, North.  Mr. Briggs had less experience, less seniority, less education and was less qualified for the position than Ms. Brooks.  In fact, he did not even work in the relevant department to qualify for the position.  Moreover, Ms. Brooks had

experience as acting Director of Sales and was coming off any outstanding year in 2013; yet, she was not even interviewed for the position.

101.    In April 2015, Ms. Brooks applied for the position of International Manager, Public Affairs.  Even though she was fully qualified for the position, Ms. Brooks was never interviewed; instead, UPS promoted Susan Zimmerman, a Caucasian female who had only been at UPS for three months as an "intern" and did not meet several of the job qualifications.

102.    In June 2015, Wanda Henderson, an African-American Sales Manager who had previously worked for Mr. Olejniczak, was promoted to take Mr. Ford's position, even though she was not performing as well as Ms. Brooks.

103.    For the past year, Ms. Brooks had been wearing braces on both hands because of an occupational injury caused by excessive laptop usage.  When she sought medical treatment, Ms. Henderson refused to allow Ms. Brooks to leave until Ms. Brooks stated that she would have no choice but to file a complaint with OSHA.

104.    In October 2015, while Ms.  Brooks was on disability leave, she learned from a coworker that her position had been filled by Judy Mattingly, a Caucasian woman.

105.    In early 2016, three Caucasian males, Chad Myers, Jessie Koski and Gary Harmon, who were substantially less experienced, had much less seniority, experience and education and were not as strong performers as Ms. Brooks, were promoted to Package Division Manager positions.  Ms. Brooks was not interviewed for any of the Package Division Manager positions, nor was she even allowed to apply for the positions, as they were not posted by UPS.

106.    On April 30, 2016, when she returned from her disability leave, Ms. Brooks was notified that she was being demoted in grade and salary.  Specifically, she was notified that she would be managing the "Take Charge" program at a reduced salary level.  This was essentially a

non-existent position – Ms. Brooks was forced to create her own job description, goals and measurements.

107.    During the next seven months, Ms. Brooks repeatedly applied for promotions and was consistently denied every position that she applied for, including an Enterprise Account Manager position, International Public Affairs Manager and Director of Public Affairs.  When Ms. Brooks was scheduled for a job interview, the interview would later be cancelled without explanation.  The individual selected for the Enterprise Account Manager position, Jason Finafrock, was a Caucasian employee who had previously reported to Ms. Brooks.  He was less experienced and educated than Ms. Brooks, and he was underperforming and failing to make his sales numbers, unlike Ms. Brooks, who always exceeded her sales numbers.

### The EEOC Issues Determination Of "Cause" Against UPS
### Finding That UPS Discriminated And Retaliated Against Ms. Brooks
### 2016

108.    On September 23, 2016, the EEOC issued a "Cause" Determination against UPS, finding that UPS engaged in gender discrimination and retaliation.  Specifically, the EEOC ruled that UPS failed to interview Ms. Brooks for positions for which she was fully qualified and instead promoted less experienced male employees.  The EEOC further found that after Ms. Brooks complained about the discriminatory conduct in May 2012, she was not promoted or allowed to transfer for career growth and was subjected to assignment of undesirable accounts, manipulation of her Career Development Readiness Assessment, and being effectively demoted without good cause.

109.    On December 1, 2016, Ms. Brooks was informed by Ms. Henderson that she would not be considered for the Public Affairs position because UPS wanted someone with postal reform experience, even though that was not listed as one of the qualifications for the

position.  Ultimately, Jessica Lawrance, a Caucasian female who was less experienced, educated and qualified than Ms. Brooks, was hired for the position from outside of UPS.

110.    The next day, on December 2, 2016, Ms. Henderson informed Ms. Brooks that she would be returning her to her previous position as Sales Manager once again and placing six individuals under her.  She later learned that five of those six individuals were underperforming and/or on performance improvement plans, which could result in their termination.  It was clear that Ms. Brooks had been placed in a position to fail by UPS – other Sales Managers did not have so many struggling or underperforming individuals assigned to them.

111.    In May 2017, Ms. Brooks was informed by Ms. Henderson that her career developmental plans were being "put on hold" until the end of the year.

112.    On June 1, 2017, Ms. Brooks filled out UPS's Business Compliance and Ethics Questionnaire, in which she disclosed that she was aware of discrimination issues.  She later heard back from Molly Ellis, UPS Corporate Compliance and Ethics, and Rodney Helus, regarding her complaints, but they never took any action to investigate her complaints or remedy the problem.

113.    On June 27, 2017, Ms. Brooks was told by a Division Manager that in the last "People's Meeting," when discussing potential diversity candidates for promotion, which was held in early June 2017, Ms. Brooks was not discussed or mentioned by management; rather, Erica McCants, a less experienced, less qualified African American female was advanced as the best diversity candidate in the Chesapeake District.

114.    In November 2017, Ms. Brooks met with Ms. Henderson who told her that she needed to decide on her career path between Package Division Manager, Director of Sales or Director of Public Affairs.  Ms. Brooks explained how she had been subjected to retaliation over

the past several years after reporting discriminatory conduct, and she made it clear that she believed she was fully qualified for a Director of Sales or Package Division Manager position.

115.    On December 6, 2017, Ms. Brooks was told by Richard Williams that Eric Levitas was coaching several of her employees to give her low GCL scores and to claim that she was an incompetent manager.  Ms. Brooks insisted that Mr. Williams report the incident to Ms. Henderson, and she held a meeting with Ms. Brooks and Mr. Williams to discuss the matter. Later, Ms. Henderson stated that there would be a full investigation of the matter.  Ms. Brooks never heard back from Ms. Henderson regarding her complaints.

116.    On December 8, 2017, Molly Ellis from UPS Corporate Compliance sent an email to Ms. Brooks to follow-up on the discrimination complaint that she had filed with Corporate Compliance more than six months earlier.  Ms. Brooks reiterated her discrimination allegations and explained how she had been subjected to retaliation. Ms. Brooks never heard back from Ms. Ellis or anybody from UPS Corporate Compliance.

117.    On December 19, 2017, Ms. Brooks filed a complaint with Kevin Garvey in UPS Human Resources to complain that several peers and subordinates were conspiring to lower her scores and to solicit complaints about her management ability and style.  She explained that she was having trouble concentrating and focusing on her job because of the relentless retaliation that she was being subjected to, and she asked for assistance in dealing with the misconduct and retaliation.

118.    On January 4, 2018, Ms. Henderson announced numerous promotions or lateral moves for various of Ms. Brooks' Caucasian peers and subordinates, including Kaycie Wiseman, Marla Miller and John Stanley, all of whom had less experience and seniority than Ms. Brooks.

119.    On January 8, 2018, Ms. Brooks met with Roxanne Allen, UPS Human Resources

manager, and explained everything that had been had been happening to her over the past twelve months, including the hostile environment and the retaliation as set forth above.  Ms. Allen asked Ms. Brooks what she wanted done about the problem, and Ms. Brooks explained that she just wanted to work in a non-hostile environment where she is judged based on her performance, not her race or gender.  Ms. Brooks never heard back from Ms. Allen.

120.    On January 11, 2018, Ms. Brooks met with Ms. Henderson for a career development meeting.  Ms. Henderson told Ms. Brooks that she was going to transition her to a Business Management position, rather than the Director of Sales position that Ms. Brooks had been positioned for over the past nineteen years.  Ms. Brooks pointed out that her performance had been excellent, and every one of her reports had made or surpassed their target numbers in the previous year; nevertheless, Ms. Henderson was insistent on transferring Ms. Brooks out of her department and repeatedly brought up false rationales for her transfer.  Ms. Henderson tried to position the transfer as a "positive" career move, but Ms. Brooks expressed her disappointment and frustration, noting that she had already held and succeeded in a Business Manager role, so this transfer was a step back, not a step forward.

121.    On January 12, 2018, Ms. Brooks received her annual GCL results, and she received a horrible rating – 1.67 out of 4.0 – which was by far the lowest score of her entire career.  This rating made no sense considering that Ms. Brooks' performance numbers were excellent, and she had no complaints filed about in the previous year by any of her subordinates or peers.

122.    On January 19, 2018, Ms. Henderson sent an email to Ms. Brooks stating that she did not believe Ms. Brooks was qualified to be a Division Sales Manger or Director of Sales, even though Ms. Brooks had been preparing for such position for years – and had repeatedly

been assured in the past that she was fully qualified for such positions.  She never explained why

she believed Ms. Brooks was not qualified, even though she was a top performer with more

experience and seniority than any other sales manager in the Chesapeake District.

123.    On January 24, 2018, Ms. Brooks met with Eddie Roach, UPS Human Resources

Manager, and filed yet another discrimination and retaliation complaint describing the recent

incidents, including Ms. Henderson's actions in telling Ms. Brooks that she was not qualified for

a promotion.

124.    In late January and early February, 2018, Ms. Brooks was suffering from extreme

stress and anxiety as a result of the discriminatory and retaliatory conduct that she was subjected

to by UPS management and peers.  She began taking anxiety medication, and her doctor had her

take some time off of work because of her extreme stress.

**Ms. Brooks Is Subjected To Additional Discrimination
And Retaliation And Files New EEOC Discrimination/Retaliation Charge
2018**

125.    Ms. Brooks filed a new Charge of Discrimination with the EEOC on February 19,

2018, Charge No. 531-2018-01933 (the "2018 EEOC Charge") setting forth additional racial and

gender discrimination and retaliation claims based on the hostile environment and retaliatory

actions she was subjected to since the 2012 EEOC Charge.

126.    On March 16, 2018, Jerry D'Anduono, a Caucasian male, was promoted to the

position of Director of Sales for the Chesapeake District, North, despite the fact that Ms. Brooks

had significantly more experience, longer seniority, higher education and was a higher performer

than Mr. D'Anduono by any numerical rating.  Ms. Brooks had previously served as Operations

Director in the Sales department, unlike Mr. D'Anduono, and she had excelled as a Sales

Manager for many more years than Mr. D'Anduono.  Yet, Ms. Brooks was not even interviewed

for the position.

127.    On April 16, 2018, the EEOC issued a Notice of Right to Sue with regards to the 2012 EEOC Charge.

128.    Ms. Brooks received the Notice of Right to Sue relating to the 2012 EEOC Charge on or about April 19, 2018.

129.    On or about May 9, 2018, Ms. Brooks filed a request with the EEOC to amend the 2018 EEOC Charge to include additional allegations of racial and gender discrimination and retaliation.

130.    On July 5, 2018, the Parties entered into a Tolling Agreement, pursuant to which all deadlines, including statutes of limitation, were tolled while the parties attempted to resolve the matter.  At that time, Ms. Brooks had approximately thirteen days remaining to file her complaint based on the Notice of Right to Sue with regards to the 2012 EEOC Charge.

131.    On August 25, 2020, the EEOC issued a Notice of Right to Sue with regards to the 2018 EEOC Charge to Ms. Brooks.

132.    On August 26, 2020, UPS notified Ms. Brooks that it was terminating the Tolling Agreement.

133.    Pursuant to the terms of the Tolling Agreement, the Tolling Agreement terminates on the tenth business day following notice by UPS that it is terminating the Tolling Agreement, *i.e.*, at midnight on Wednesday, September 9, 2020.

134.    Ms. Brooks is filing this Complaint within ninety (90) days of her receipt of the 2102 and 2108 Right to Sue Letters and within ten (10) days of the termination of the Tolling Agreement.

## COUNT I – GENDER/RACIAL DISCRIMINATION
### (Title VII)

135.   Plaintiff repeats and realleges all of the allegations in the preceding paragraphs of this Complaint as if the same were fully set forth herein.

136.   Ms. Brooks is a member of a protected class, African-American, entitled to protection against racial discrimination under Title VII.

137.   Ms. Brooks is a member of a protected class, Female, entitled to protection against gender discrimination under Title VII.

138.   During all relevant times, UPS was Ms. Brooks' "employer" for purposes of Title VII.

139.   Defendant UPS discriminated against Ms. Brooks based on her race, African-American, and gender, Female, by treating her differently than other, similarly-situated, non-African-American employees and male employees and repeatedly denying her promotions based on false or pretextual reasons.

140.   Ms. Brooks has suffered substantial financial and emotional distress damages as a direct result of the discriminatory conduct of UPS.

WHEREFORE, Ms. Brooks demands judgment in an amount greater than two-million dollars ($2,000,000.00) against Defendant UPS in compensatory damages, including back pay and front pay, compensatory damages for emotional distress, punitive damages, attorney's fees, interest and costs and any and all other relief deemed appropriate by this Court.

## COUNT II – RETALIATION
### (Title VII)

141.   Plaintiff repeats and realleges all of the allegations in the preceding paragraphs of this Complaint as if the same were fully set forth herein.

31

142.     Ms. Brooks a member of a protected class, African-American, female, entitled to protection against retaliation under Title VII.

143.     During all relevant times, UPS was Ms. Brooks' "employer" for purposes of Title VII.

144.     Defendant UPS retaliated against Ms. Brooks by treating her differently from other similarly-situated employees who had not complained about gender and/or racial discrimination and repeatedly refusing to promote her to positions for which she was fully qualified because she engaged in protected activity.

145.     The persons who received promotions that were not given to Ms. Brooks had not engaged in protected activity and were less qualified for the positions than Ms. Brooks.

146.     Ms. Brooks suffered substantial financial and emotional distress damages as a direct result of the discriminatory conduct of UPS.

WHEREFORE, Ms. Brooks demands judgment in an amount greater than two million dollars ($2,000,000.00) against Defendant UPS in compensatory damages, including back pay and front pay, compensatory damages for emotional distress, punitive damages, attorney's fees, interest and costs and any and all other relief deemed appropriate by this Court.

## COUNT III – RACIAL DISCRIMINATION/RETALIATION
### (Section 1981)

147.     Plaintiff repeats and realleges all of the allegations in the preceding paragraphs of this Complaint as if the same were fully set forth herein.

148.     Ms. Brooks is a member of a protected class, African-American, entitled to protection against racial discrimination and retaliation under Section 1981.

149.     During all relevant times, UPS was Ms. Brooks' "employer" for purposes of

Section 1981.

150.    Defendant UPS discriminated against Ms. Brooks by treating her differently

than other, similarly-situated, non-African-American employees and later retaliating against Ms.

Brooks for engaging in protected activity and complaining about her discriminatory treatment.

151.    Ms. Brooks suffered substantial financial and emotional distress damages as a

direct result of the discriminatory and retaliatory conduct of UPS

WHEREFORE, Ms. Brooks demands judgment in an amount greater than two million

dollars ($2,000,000.00) against Defendant UPS in compensatory damages, including back pay

and front pay, compensatory damages for emotional distress, punitive damages, attorney's fees,

interest and costs and any and all other relief deemed appropriate by this Court.

Dated: September 11, 2020                            Respectfully Submitted,


                                                     _____/s/_____
                                                     Andrew M. Dansicker (Bar # 11765)
                                                     D. H. Andreas Lundstedt (Bar # 28620)
                                                     Law Office of Andrew M. Dansicker, LLC
                                                     Executive Plaza II, Suite 705
                                                     11350 McCormick Road
                                                     Hunt Valley, Maryland 21031
                                                     Telephone: 410-771-5668
                                                     Facsimile: 443-927-7390
                                                     adansicker@dansickerlaw.com

                                                     *Counsel for Plaintiff Terrina Brooks*

## **PRAYER FOR JURY TRIAL**

Plaintiff Terrina Brooks hereby requests a jury trial.


_____/s/_____
Andrew M. Dansicker