IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRINA A. BROOKS                    :

                                     :

    v.                               :    Civil Action No. DKC 20-2617

                                     :

UNITED PARCEL SERVICE INC.           :

                                     :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case are two motions filed by Defendant United Parcel Service Inc. ("UPS"): (1) a partial motion to dismiss and (2) a motion to strike. (ECF No. 15-1). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part and the motion to strike will be denied.[1]

I.   **Factual Background**

Unless otherwise noted, the facts outlined here are either set forth in the amended complaint or evidenced by the Equal Employment Opportunity Commission ("EEOC") charges and amendments referenced in the amended complaint and attached as exhibits to UPS's motion to dismiss. The facts are construed in the light most favorable to the Plaintiff.

─────────────────

[1] UPS's invitation in its reply to convert the motion to one for summary judgment, (ECF No. 21, at 9 n.6), is declined.

Terrina Brooks is an African American woman and long-time UPS employee. She advanced steadily within the company's greater Washington, D.C. operations throughout the 1990s. In 1999, she was named to the "Ready Now" list of candidates for promotion to division-manager-level positions. But Ms. Brooks was not "ready" to hold another position to which she aspired - director of sales. She needed experience as an Area Sales Manager and was assigned that role in January 2000. Over the next ten years, Ms. Brooks amassed a stellar performance record and received numerous awards. In 2008, she was moved into a higher profile Enterprise Account Executive Sales Manager role. In January 2010, she was entrusted with "the largest account in UPS history" and worth more than $100 million. (ECF No. 14, ¶ 32). Throughout, Ms. Brooks made clear that she wanted to be promoted but never was.

## A. Before Ms. Brooks' 2012 EEOC Charge

In 2010, Ms. Brooks began reporting to Sheldon Allen, who was named Director of Sales for the southern Chesapeake District. In June, Mr. Allen asked Ms. Brooks to reassume an Area Sales Manager position to help turn around an underperforming territory. Ms. Brooks resisted, explaining that she'd been on the "Ready Now" list for more than ten years and "did not want to be effectively held back yet again[.]" (ECF No. 14, ¶ 33). Mr. Allen explained that he needed the best performers and Ms. Brooks acquiesced. The

white man Ms. Brooks replaced, Kevin Fox, was moved into Ms. Brooks' more desirable Enterprise Account Manager position.[2]

Ms. Brooks remained concerned. By August 2011, she reached out to a senior colleague, Myron Williams, and told him that she worried gender and race discrimination were behind her career stagnation. This perception was reinforced in 2010 and 2011 when four white, male sales managers "were provided opportunities for advancement in the Enterprise and Government Sales Groups," (ECF No. 14, ¶ 39), while Mr. Allen kept Ms. Brooks in the Areas Sales role and said she was "too valuable" to be promoted, (id., ¶ 40).

Ms. Brooks nevertheless continued her strong performance and believed she was poised for higher positions. In December 2010, she temporarily assumed Mr. Allen's Director of Sales duties while he was on short-term disability. In 2011, she was the top performing sales manager in the Chesapeake District. On January 25, 2012, Ms. Brooks gave a presentation to both the President and Vice President of Sales "as the 'Ready Now' candidate for a Director of Sales position." (ECF No. 14, ¶ 46).

On January 30th, Ms. Brooks' fortunes changed. Jon Weed, an African American Senior Account Manager who reported to her, resigned because he had not been promoted in several years. Mr.

---

[2] Ms. Brooks appears to refer to Enterprise Account Executive Sales Manager and Strategic Account Sales Manager positions interchangeably. (See, e.g., ECF No. 14, ¶¶ 28, 32-33). This summary uses only the former for consistency.

Allen "yelled and screamed" at Ms. Brooks, blaming her for Mr. Weed's departure. (ECF No. 14, ¶ 47). That evening, Ms. Brooks called Myron Williams "to inform him that she was thinking about resigning because of the disrespect and verbal abuse" she received from Mr. Allen and her lack of advancement. (*Id.*, ¶ 49). Mr. Williams was the UPS East Region Manager and supervised Mr. Allen's boss. He was also a long-time mentor to Ms. Brooks and she'd told him five months earlier that she was concerned she was being discriminated against. Mr. Williams advised her not to resign and told her about an opening for a promotion to Enterprise Director.

The next day, Mr. Allen interrogated Ms. Brooks about her conversation with Mr. Williams. He also criticized her job performance. He had never raised these concerns with Ms. Brooks before. Ms. Brooks called Mr. Williams again that night. He acknowledged he'd spoken to Mr. Allen about their conversation the prior day. Ms. Brooks told Mr. Williams that she believed Mr. Allen was retaliating against her for complaining to him. She also reiterated "that there were no management opportunities for females in the Chesapeake District under Mr. Allen." (ECF No. 14, ¶ 51). Mr. Allen soon announced that he was giving all his sales managers "makeshift" performance reviews. (*Id.*, ¶ 52). In truth, only Ms. Brooks was reviewed and she received negative marks.

Meanwhile, Ms. Brooks applied for the Enterprise Director position. Mr. Allen discouraged her from seeking the role, telling

her "she would not want to work for the 'white boys[.]'" (ECF No. 14, ¶ 54).  On February 22, 2012, Ms. Brooks learned that the Enterprise Director position had been filled by a white man – Stewart Reynolds.  Mr. Reynolds had far less experience at the company and was less educated than Ms. Brooks.  Ms. Brooks was not interviewed.  The hiring manager told her that Mr. Allen did not support her application.  He also rated her a "minimal performer."

In April 2012, Mr. Allen gave Ms. Brooks another review.  She "received the lowest performance rating" of her career and was denied both a merit bonus and an annual raise.  (ECF No. 14, ¶ 59). All the other sales managers reporting to Mr. Allen received an annual raise, something Ms. Brooks had never been denied.  In or around May 2012, Ms. Brooks reported Mr. Allen's conduct to UPS. The HR Director later dismissed her complaints about Mr. Allen because he "seem[ed] like a really nice guy." (*Id.*, ¶ 65).

On October 5, 2012, Ms. Brooks learned that a $2 million account she had secured—Downtown Locker Room—would be reassigned to a white, male sales manager named George Donnelly.  Believing that she faced a growing retaliatory campaign by Mr. Allen, Ms. Brooks filed a Charge of Discrimination with the EEOC on October 16, 2012, alleging race and gender discrimination and retaliation.[3]

---

[3] Elsewhere, Ms. Brooks suggests that she was removed from the Downtown Locker Room account after she filed her EEOC charge. (ECF No. 14, ¶ 69).

**B.   After Ms. Brooks' 2012 EEOC Charge**

In early December, Mr. Allen announced that Ms. Brooks would be reassigned to "the worst territory [with] the worst performing employees" in the southern Chesapeake District.   (ECF No. 14, ¶ 73).  All of Ms. Brooks' most profitable accounts were reassigned to white men.  On December 24, Mr. Allen told Ms. Brooks, "Your career has been put on hold.  You will not be promoted or transferred.  Because of your complaint to the EEOC . . . the District Manager[] does not trust you, so you cannot be promoted." (ECF No. 14, ¶ 74).  The district manager later told Ms. Brooks she'd never said those things.

In the following months, Mr. Allen repeatedly singled Ms. Brooks out and took actions harmful to her career, including reassigning declining accounts from other sales managers to Ms. Brooks and her direct reports, refusing to discuss Ms. Brooks' recommendations for promotions (as he did with Ms. Brooks' white peers), and demoting Ms. Brooks from the "Ready Now" list to the "Rotation 3-5 Years" list.  In July 2013, Mr. Allen was replaced as Director of Sales by a white man.  Ms. Brooks was not considered for the job or interviewed.

After Mr. Allen's departure, Ms. Brooks regularly complained to UPS about ongoing discrimination and retaliation by a varied group of employees.  She continued to be passed over for more senior roles, including three different Director of Sales

openings.  She was also demoted to a lower-paying job.  Meanwhile, other white, male sales managers received better treatment.  In September 2016, EEOC issued a determination on Ms. Brooks' 2012 Charge, finding there was "reasonable cause to believe that [UPS] denied [Ms. Brooks] promotion and transfer and subjected her to unequal terms and conditions of employment and demotion because of her sex (female) and in retaliation for engaging in protected activity[.]"  (ECF No. 19-1, at 3).

### C.  Ms. Brooks' 2018 Charge

In December 2016, Ms. Brooks' new Director of Sales, Wanda Henderson, returned her to an Area Sales Manager position but assigned her underperforming direct reports.  In May 2017, Ms. Henderson told Ms. Brooks her career development plans were "on hold."  (ECF No. 14, ¶ 111).  In January 2018, Ms. Henderson announced promotions and lateral transfers for at least three of Ms. Brooks' white peers and subordinates.  Later that month, Ms. Henderson told Ms. Brooks that she would transition into a Business Manager role.  Ms. Brooks had held the position in 1998 and viewed it as a demotion.  The next day, Ms. Brooks received one of the lowest performance scores of her career.

On February 19, 2018, Ms. Brooks filed a new EEOC charge.  On March 16, 2018, a white man was promoted to Director of Sales for the northern Chesapeake District.  Ms. Brooks had more experience at UPS, higher performance scores, and was better educated.  Ms.

Brooks was neither interviewed nor considered for the role.   On May 9, 2018, she filed a request to amend the February Charge.

## II.  Procedural Background

As noted above, Ms. Brooks filed two EEOC charges and one amendment.   The first Charge was filed on October 16, 2012 and alleged continuing race and sex discrimination and retaliation beginning May 1, 2010.  (ECF No. 15-5).   It covered Ms. Brooks' entire career with UPS and focused primarily on the company's failure to promote her and Mr. Allen's retaliation against her. The EEOC issued a Determination on the 2012 Charge in September 2016.   (ECF No. 19-1).   The parties entered conciliation negotiations in July 2017.  (ECF No. 15-6, at 4).

Ms. Brooks filed her second charge on February 19, 2018. (ECF No. 15-6).  It was styled as an amendment to the 2012 Charge but treated as a new charge by the EEOC and the parties.   The Charge alleged continuing race, sex, color, and age discrimination and retaliation from July 2010 onward.   It stated that Ms. Brooks "experienced ongoing retaliation" after filing her 2012 Charge, had submitted a rebuttal to an EEOC investigator in 2013 detailing some additional acts, and that the EEOC had issued a determination in her favor in 2016.  (ECF No. 15-6, at 3-4).   The relevant new allegations related to Wanda Henderson's decisions to demote Ms. Brooks, reinstate her with subpar direct reports, and not promote her in favor of white men.

Ms. Brooks received a Notice of Right to Sue on her 2012 Charge on or about April 19, 2018.[4] (ECF No. 14, ¶ 128). She then filed an amendment on May 9, 2018, adding to her allegations a white man's promotion to Director of Sales after she filed the February 2018 Charge. (ECF No. 15-7). The parties entered into a tolling agreement on July 5, 2018. Ms. Brooks received a Right to Sue Notice on her 2018 Charge on August 25, 2020 and UPS terminated the tolling agreement effective September 9, 2020.

Ms. Brooks filed her initial complaint in this court on September 11, 2020. (ECF No. 1). She included three counts: (1) Title VII gender and race discrimination, (2) Title VII retaliation, and (3) race discrimination and retaliation under 42 U.S.C. § 1981. (ECF No. 14, at 33-35). UPS then filed motions to dismiss and strike that were denied as moot after Ms. Brooks amended her complaint. (ECF Nos. 7; 12 - 14). The amended complaint is construed to assert claims for twenty-seven discrete acts of discrimination and retaliation. UPS put forward this construction, (*see* ECF Nos. 15-1, at 1 & n.2; 15-4), and Ms. Brooks adopted it, (ECF No. 19, at 9 n.2). In January 2021, UPS again moved to dismiss in part and to strike a portion of the amended complaint. (ECF No. 15). Ms. Brooks filed her response, and UPS its reply, in March 2021. (ECF Nos. 19; 21).

---

[4] Ms. Brooks alleges that the Notice of Right to Sue was issued on April 16 and that she received it three days later.

### III. Motion to Dismiss in Part

UPS moves to dismiss some, but not all, of Ms. Brooks' Title VII and Section 1981 claims.   The parties disagree about which exhibits can be considered at this stage.   Only attached documents "integral to the complaint and authentic" may be considered on a motion to dismiss.   *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).   "[M]atters outside the pleadings" must otherwise be excluded.   Fed.R.Civ.P. 12(d).   Ms. Brooks' EEOC Charges, (ECF Nos. 15-5; 15-6), Amendment, (ECF No. 15-7), and Determination, (ECF No. 19-1), will be considered because the amended complaint references all four documents, (ECF No. 14, ¶¶ 68, 108, 125, 129), UPS does not challenge their authenticity, and Ms. Brooks consents, (ECF No. 19, at 9 n.2).   *See Avery v. Astrue*, No. 11-cv-2612-WDQ, 2012 WL 1554646, at *1 & n.4 (D.Md. Apr. 27, 2012) (considering EEOC charge filed by third party); *Cuffee v. Verizon Commc'ns, Inc.*, 755 F.Supp.2d 672, 676 & n.2 (D.Md. 2010) (considering defendant-attached EEOC charge).   The UPS employment records, (ECF Nos. 15-8 - 15-16), and the EEOC file excerpt, (ECF No. 21-1), cannot be considered because none of the documents are referenced in the amended complaint and Ms. Brooks contests the accuracy of the employment records, (ECF No. 19-3, ¶ 4).

### A.   Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint.   *Presley v. City of Charlottesville*,

464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[] of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

**B.  Summary of Arguments**

UPS affirmatively concedes that several of Ms. Brooks' claims will move forward. For example, the company concedes that all of her claims surrounding the decision to deny her the Enterprise Director position in February 2012 and to deny her job opportunities in early 2018 may proceed. It also concedes that Ms. Brooks has stated several Section 1981 failure-to-promote claims in 2015 and 2016. The question, then, is not whether this

case moves to discovery, but only which claims proceed along with the conceded claims.

For Title VII, UPS contends that Ms. Brooks' unconceded claims fail on three grounds: (1) timeliness, (2) exhaustion, and (3) failure to state a claim.  For Section 1981, UPS contends that Ms. Brooks' unconceded claims fail on two grounds: (1) timeliness, and (2) failure to state a claim.  The parties disagree most urgently about whether the Title VII exhaustion requirement dooms claims arising from certain events between Ms. Brooks' 2012 EEOC Charge and 300 days prior to her 2018 Charge.

### C.   Title VII Timeliness

Title VII requires a plaintiff to file a charge of discrimination with the EEOC before filing suit in federal court. 42 U.S.C. § 2000e-5(e)(1), (f)(1).  The purpose of this exhaustion requirement is to put employers on notice to potential misconduct and afford them the opportunity to remedy it with the complaining employee more quickly and efficiently than litigation allows. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  The statute prescribes a limitations period.  In deferral states, like Maryland, the limitations period is 300 days from the date of the alleged discriminatory act.  The limitations period runs from the time the employment decision is made and communicated. *Del. State Coll. v. Ricks*, 449 U.S. 250, 261-62 (1980).

The events included in Ms. Brooks' amended complaint can be divided into four time periods: (1) more than 300 days before the 2012 Charge, (2) within 300 days before the 2012 Charge, (3) after the 2012 Charge and more than 300 days before the 2018 Charge, and (4) within 300 days before the 2018 Charge or Amendment.   UPS argues that all claims in period 1 are time-barred as to the 2012 Charge and all claims in period 3 are time-barred as to the 2012 and 2018 Charges.  (ECF No. 15-1, at 9-11).

### 1.   Events More than 300 Days Before the 2012 Charge

UPS argues that the amended complaint contains one time-barred claim in this period.  (ECF No. 15-1, at 10-11).  The underlying events—the advancement of four white men in the sales group—allegedly occurred "[d]uring 2010 and 2011." (ECF No. 14, ¶ 39).   UPS contends that all four promotions are untimely by relying on employment records that cannot be considered at the motion to dismiss stage, as discussed above.  Because Ms. Brooks cabined her claims to those arising within the limitations period, (ECF No. 14, ¶¶ 139, 144), the only possible claims are for 2011 promotions.   Any claims centered on 2011 promotions cannot be dismissed as untimely because "the face of the complaint [does not] clearly reveal[]" that the promotions occurred before the limitations period began to run on December 21, 2011. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

13

UPS's motion to dismiss on timeliness grounds claims occurring more than 300 days before the 2012 Charge will be denied.

## 2. Events After the 2012 Charge and More than 300 Days Before the 2018 Charge

Ms. Brooks makes only one attempt to assert the timeliness of claims during the period between her 2012 Charge and the beginning of the limitations period for the 2018 Charge. She invokes the "continuing violation" doctrine, (ECF No. 19, at 12-13), which "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination[.]" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). The doctrine only applies, however, to hostile work environment and harassment claims. *See Morgan*, 536 U.S. at 116-17, 116 n.10; *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 n.5 (4th Cir. 2019). Because Ms. Brooks alleges only discrete acts of discrimination and retaliation, the doctrine does not apply.[5] As discussed below, however, there are circumstances in which retaliation claims arising after the filing of a charge

---

[5] A modified version of the "continuing violation" doctrine allows plaintiffs to bring Title VII claims for timely payments made pursuant to an untimely compensation decision. 42 U.S.C. § 2000e-5(e)(3)(A). That rule does not apply here, although Ms. Brooks alleges she twice received reduced payments because of discrimination. The first claim is already timely as to the 2012 Charge. (*See* ECF No. 14, ¶¶ 59-60). The second cannot be tied to timely payments because Ms. Brooks was returned to her earlier salary before the relevant limitations period. (*Id.*, ¶¶ 106, 110).

may be included in a subsequent complaint.  Ms. Brooks' claims in this period outside such circumstances are untimely because they occurred more than 300 days before the 2018 Charge.

### D.   Title VII Exhaustion

UPS argues that Ms. Brooks failed to exhaust (1) all claims between the 2012 Charge and the limitations period for the 2018 Charge, and (2) certain timely claims.

#### 1.   Claims After the 2012 Charge and Before the Limitations Period for the 2018 Charge

Ms. Brooks argues that discrimination and retaliation claims after her 2012 Charge and before the limitations period for her 2018 Charge can be included in the complaint, and need not be assessed for timeliness or exhaustion against the 2018 Charge. She contends that (1) they are reasonably related to the 2012 Charge, (2) they would have been or were uncovered by the EEOC's investigation, and (3) UPS was given adequate notice of the claims. (ECF No. 19, at 12).  She also argues that she can include her post-charge retaliation claims because they "arise from and relate to the filing of the underlying EEOC Charge[.]"[6]  (*Id.*, at 13). Ms. Brooks is wrong about her between-charge discrimination claims and right about her between-charge retaliation claims.

---

[6] Ms. Brooks also points to the "continuing violation" doctrine.  (ECF No. 19, at 12-13).  As discussed above, that doctrine does not apply here.

**a)   Ability to Bring Any Post-Charge Claims**

Title VII requires plaintiffs to file a charge with the EEOC within a specific time period "after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e-5(e)(1). Until the Supreme Court's decision in *Morgan*, plaintiffs could bring some claims outside the required time period. Courts, including the Fourth Circuit, widely held that plaintiffs did not need to file a new EEOC charge for subsequent retaliation. *E.g.*, *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992); *see* Lawrence D. Rosenthal, *To File (Again) or Not to File (Again)*, 66 Baylor L. Rev. 531, 537-550 (2014). Some courts also allowed post-charge discrimination claims when they were part of a "continuing violation." *E.g.*, *Anderson v. Reno*, 190 F.3d 930, 936 (9th Cir. 1999).

In *Morgan*, the Supreme Court rejected the "continuing violation" doctrine's application to claims for discrete acts of discrimination and retaliation that occurred before the Title VII limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 113-14 (2002). Writing for a unanimous court, Justice Thomas strictly interpreted the statutory text requiring that a plaintiff file his or her charge "after" the alleged unlawful act and adopted a broad holding that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." *Id.* at 105, 109-10.

16

Post-*Morgan*, the trend in the federal courts of appeals has been to hold that discrimination claims must be exhausted by a subsequent EEOC charge or to refrain from deciding. *See Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 n.1 (D.C. Cir. 2019) (declining to decide); *Simmons-Meyers v. Caesars Ent. Corp.*, 515 F.App'x 269, 273 (5th Cir. 2013) (requiring later exhaustion) (unpublished); *Wedow v. Kansas City, Mo.*, 442 F.3d 661, 673-74 (8th Cir. 2006) (requiring later exhaustion except in narrow circumstances); *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (requiring later exhaustion). Courts in this district assume that discrimination claims must be exhausted by a later charge. *See Sharpe v. Prince George's Cnty.*, No. 17-cv-3799-TDC, 2021 WL 928177, at *10 (D.Md. Mar. 11, 2021); *Garnes v. Maryland*, No. 17-cv-1430-RDB, 2018 WL 276425, at *6 (D.Md. Jan. 3, 2018). Where pre-*Morgan* rules continue to be applied, the decisions do little to grapple with *Morgan*. *See Williams v. Bd. of Educ. of Chi.*, 982 F.3d 495, 503 n.13 (7th Cir. 2020) (acknowledging rule allowing post-charge claims where "like or reasonably related" without discussing *Morgan*); *Thornton v. United Parcel Service, Inc.*, 587 F.3d 27, 31 (1st Cir. 2009) (acknowledging rule allowing post-charge claims within the "scope of the investigation").

The only Fourth Circuit decision Ms. Brooks points to does not authorize post-charge discrimination claims. *Stewart v. Iancu* stated that "the scope of a Title VII lawsuit may extend to any

kind of discrimination like or related to allegations contained in
the charge and growing out of such allegations during the pendency
of the case before the [EEOC]." 912 F.3d 693, 705 (4th Cir. 2019)
(internal quotation marks omitted) (quoting *Hill v. W. Elec. Co.*,
672 F.2d 381, 390 n.6 (4th Cir. 1982)). But this language was used
to demonstrate only that plaintiffs need not specifically recite
each event to the EEOC before filing a claim in federal court and
it did not clearly address post-charge claims. It is unlikely the
Fourth Circuit intended such dicta to establish a position contrary
to *Morgan*'s broad holding and to the weight of on-point post-
*Morgan* authorities. For this reason, Ms. Brooks' citation to
*Dawson v. Washington Gas Light Company*, a district court decision
relying on the same language, is unpersuasive. No. 18-cv-971,
2019 WL 692803, at *3 (D.Md. Feb. 19, 2019). Ms. Brooks cannot
bring claims for discrimination that occurred after the 2012 Charge
and more than 300 days before the 2018 Charge.

By contrast, the Fourth Circuit took a definitive position in
the circuit split regarding post-charge retaliation claims,
*compare Martinez*, 347 F.3d at 1210-11, *with Duplan v. City of New
York*, 888 F.3d 612, 622 (2d Cir. 2018). A plaintiff may "raise
for the first time in federal court the claim that her employer
retaliated against her[.]" *Hentosh v. Old Dominion Univ.*, 767
F.3d 413, 416 (4th Cir. 2014) (citing *Nealon v. Stone*, 958 F.2d
584, 590 (4th Cir. 1992)). This rule survives *Morgan*. *Jones v.*

18

*Calvert Grp., Ltd.*, 551 F.3d 297, 302 (4th Cir. 2009) (quoting *Nealon*, 958 F.2d at 590), *abrogated on other grounds by Fort Bend Cnty. v. Davis*, 139 S.Ct. 1843, 1846, 1848–51 (2019).   It also applies to retaliation that is taken because of an EEOC charge and to continuing retaliation.  *Id.* at 304.  The unique treatment for retaliation claims is justified because a plaintiff who faced retaliation for filing an EEOC charge "would naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation."  *Hentosh*, 767 F.3d at 417 (internal quotations omitted).

UPS argues, nevertheless, that Ms. Brooks' filing of her 2018 Charge bars her from exhausting post-charge retaliation claims through her 2012 Charge.  (ECF No. 21, at 16–17).  UPS is mistaken.  True, courts in this district have said that retaliation claims may not proceed where they "could have been raised" in a later EEOC charge but were not.  *Cherry v. Bealefeld*, No. 08-cv-1228-CCB, 2010 WL 917421, at *7 (D.Md. Mar. 9, 2010) (unpublished) (citing *Riley v. Tech. Mgmt. Servs. Corp.*, 872 F.Supp. 1454, 1460 (D.Md. 1995)).  But nearly all the decisions UPS cites apply the rule to plaintiffs that filed only one EEOC charge.  *Hunter v. Vilsack*, No. 07-cv-2655-DKC, 2010 WL 1257997, at *7-8, *10 (D.Md. Mar. 26, 2010) (single Merit Systems Protection Board appeal filed after withdrawing EEOC charge); *Cherry*, 2010 WL 917421, at *3, *7 (single EEOC charge filed after earlier informal EEOC complaint).

The only decision it cites applying the rule to a plaintiff who filed multiple EEOC charges relied on the decisions in one-charge cases. *See Beck-Pell v. Sheet Metal Workers Local #100*, No. 17-cv-2329-PWG, 2019 WL 3841935, at *7 (D.Md. Aug. 15, 2019) (relying on *Hunter* and *Cherry*).

The rule UPS cites does not mean that a plaintiff bringing claims that fall between two EEOC charges is always unable to advance those claims based on the first charge. As Judge Chuang recently observed, no authority requires, "in cases with multiple EEOC charges, [that] follow-on retaliation claims must be exhausted through subsequent charges[.]" *Sharpe*, 2021 WL 928177, at *10. The mere fact that a plaintiff filed a later EEOC charge does not mean the conditions that justify allowing post-charge retaliation claims are absent. Many such plaintiffs may have feared further retaliation after filing their first charge. *See id*. And many such plaintiffs' subsequent charges may be about events wholly unrelated to the prior retaliation.

Filing a later charge does not undermine the policy allowing post-charge retaliation claims if it is sufficiently disconnected from the earlier charge. A subsequent charge is more likely to be disconnected where it is distant in time from the earlier charge, alleges "different events," and is filed after the pendency of the EEOC investigation into the earlier charge. *See Sharpe*, 2021 WL 928177, at *10. By contrast, a plaintiff might be expected to

20

include her retaliation claims in a later charge where that charge was close in time to the earlier charge, was part of a series of charges, and alleged the same or related events.  This is consistent with those decisions that have required exhaustion through a later charge because they typically feature a plaintiff that has filed several EEOC charges in close succession.  *See Fowler v. Dep't of Corr.*, No. 10-cv-3230-JFA, 2013 WL 12455973 (D.S.C. Mar. 8, 2013) (unpublished) (two subsequent charges in same year); *Smith v. Potter*, No. 09-cv-0587, 2010 WL 5288183, at *10 (M.D.N.C. Dec. 17, 2010) (unpublished) (at least four subsequent charges).

Ms. Brooks' 2018 Charge is not closely connected to her 2012 Charge, even though she styled it as an amendment to that earlier Charge.  The 2018 Charge was filed nearly six years after the 2012 Charge and after the EEOC had filed a Determination regarding the 2012 Charge.  It referenced different people and time periods than the 2012 Charge, even if the alleged UPS conduct was similar.  Moreover, Ms. Brooks participated in four years of EEOC investigation and up to one-and-a-half years of conciliation negotiations before she filed the 2018 Charge.  (*See* ECF Nos. 19, at 11; 19-1).  Nothing here undermines the justification for allowing post-charge retaliation claims.  It would be unreasonable to expect Ms. Brooks to have filed additional charges that might

21

have invited further retaliation.  It would also penalize her good faith participation in the administrative process.

Ms. Brooks can bring claims that UPS retaliated against her for filing the 2012 Charge without exhausting them through the 2018 Charge.  The sole question remaining is which of these claims were sufficiently tied to her 2012 Charge to go forward.

**b)   Ms. Brooks' Valid Post-Charge Retaliation Claims**

Ms. Brooks can bring those post-charge retaliation claims that are "like or related to allegations contained in the [2012] charge and growing out of such allegations[.]"  *See Nealon*, 958 F.2d at 590.  "The critical question" is whether the retaliation claims "relate[] back" to her 2012 EEOC Charge.  *Jones*, 551 F.3d at 304.  Such claims can be brought even when they occur after the pendency of the EEOC investigation, including after a notice of right to sue letter has been issued or a civil lawsuit filed.  *Id.* at 302-03 (citing *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988); *Gottlieb v. Tulane Univ.*, 809 F.2d 278, 280 (5th Cir. 1987)).  Here, UPS argues only that post-charge retaliation claims were untimely if they occurred before the 2018 Charge limitations period.  (ECF No 15-1, at 9-10).

Ms. Brooks pleaded that each of these acts occurred because of the 2012 Charge and because of her internal complaints.  "[A]n act committed by an employer in retaliation for the filing of an EEOC [charge] is reasonably related to that [charge][.]"  *Brown v.*

22

*Hartshorne Public Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988) (cited favorably in *Jones*, 551 F.3d at 304).   A plaintiff can therefore assert those post-charge claims she explicitly alleges were taken because the charge was filed.   *See Hentosh*, 767 F.3d at 415, 417 (undisputed that retaliation claim exhausted where plaintiff alleged employer denied her tenure because she filed an EEOC charge); *Nealon*, 958 F.2d at 590 (allowing claims in part because plaintiff alleged "the Army retaliated against her" for filing a charge).   Ms. Brooks can bring all her between-charge retaliation claims to the extent she alleges they were caused by her 2012 Charge.

To the extent Ms. Brooks alleges that between-charge retaliation claims were caused by pre- or post-charge internal complaints, the retaliation must be closer to a "continuation of the retaliation she alleged in the charge."   *See Jones*, 551 F.3d at 304.   This is more like the exhaustion analysis for otherwise timely claims, which looks primarily to whether an employer was put on notice to the claims, *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005), and allows those claims "reasonably related to the original [charge], and those developed by reasonable investigation [of that charge]." *Thorn v. Sebelius*, 766 F.Supp.2d 585, 596 (D.Md. 2011) (quoting *Jones*, 551 F.3d at 300), *aff'd*, 465 F.App'x 274 (4th Cir. 2012) (unpublished).

Consistent with these principles, a Title VII suit may not present entirely new factual bases or entirely new theories of liability from those set forth in the initial EEOC charge. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963–64 (4th Cir. 1996). Thus, where "administrative charges reference different time frames, actors, and [] conduct than the central factual allegations in [her] formal suit," the plaintiff has not exhausted her claims. *Chacko*, 429 F.3d at 506. A claim may also be barred if "the administrative charge alleges one type of [conduct]—such as [] failure to promote—and the claim encompasses another type—such as [reductions] in pay and benefits." *Id.* at 509 (internal citation omitted).

All of Ms. Brooks' post-charge retaliation claims based on internal complaints satisfy these requirements. To start, Title VII's notice concern is likely addressed where claims are included in an EEOC investigation and determination and were part of conciliation negotiations. As Ms. Brooks argues, all but two post-charge retaliation claims were in fact a part of the EEOC's investigation into the 2012 Charge and were the subject of conciliation negotiations between Ms. Brooks and UPS. (ECF Nos. 19, at 11-12; 15-6, ¶ 2).

The EEOC's September 2016 Determination concluded that Ms. Brooks was retaliated against when she (1) was assigned "accounts that were going out of business" (or her staff was), (2) "ha[d]

24

her Career Development Readiness Assessment [(the "Ready Now" lists)] manipulated . . ., [(3) [was] denied promotion/transfer, and [(4)] [was] recently [] placed in a holding position which is considered a demotion[.]"  (ECF No. 19-1, at 2-3).  All four categories of post-charge retaliatory conduct relate back to the 2012 Charge, in which Ms. Brooks checked the boxes for retaliation and "Continuing Action."  (ECF No. 15-5, at 2).

The latter three categories are closely related to Ms. Brooks' 2012 Charge.  That Charge is, at its core, about Ms. Brooks' unsuccessful pursuit of transfers and promotions despite her exceptional performance.  (*See generally* ECF No. 15-5, at 3-8).  Ms. Brooks was most aggrieved by her supervisors' refusal to promote her to roles like "District Manager" (or, presumably, other more senior roles at the Division-level or Director level), or at least reward her with more high-profile manager roles in the Enterprise and Government Sales groups.  (*Id.*, at 3-4).  UPS was on notice to retaliation claims centered on similar conduct.  This notice extended to any claims that Ms. Brooks' eligibility for promotions was altered or that she was demoted because such conduct goes directly to the same core complaint – that Ms. Brooks' supervisors were set on keeping her out of more senior positions in part because she complained about discrimination.

Furthermore, Ms. Brooks' 2012 Charge alleged that Sheldon Allen had already retaliated against her in two of these ways for

making internal complaints: denying her a promotion or transfer and manipulating her performance reviews. She alleged that he sabotaged her application to an Enterprise position in February 2012 because she had complained to Myron Williams. (ECF No. 15-5, at 5-7). She also alleged that in early 2012 Mr. Allen adjusted her Career Development ratings, gave her false and negative and performance scores, and denied her a raise. (*Id.*, at 7). As discussed above, both of these two types of conduct also go to the core of Ms. Brooks' allegations.

Ms. Brooks' reassignment allegations are also related to the 2012 Charge. The reassignments were the "the predictable culmination of [UPS's] alleged retaliatory conduct." *Jones*, 551 F.3d at 304. This is undoubtedly true for any reassignments made by Mr. Allen, who Ms. Brooks complained had retaliated against her multiple times in her Charge, as discussed above. Plus, Ms. Brooks supplements those charges with statements allegedly made by Mr. Allen after the EEOC Charge that directly support an inference of retaliatory intent. (ECF No. 14, ¶ 74).

The same logic applies to reassignments carried out by Thomas White. Mr. White was the Managing Director of Sales and Mr. Allen's direct supervisor. In her 2012 Charge, Ms. Brooks alleges that he acted in concert with Mr. Allen as part of her management team and suggests he likely also did so to undermine her promotion opportunities. (ECF No. 15-5, at 4, 6-7). UPS was equally on

26

notice to any post-charge retaliation from Mr. White as it was to Mr. Allen.

Ms. Brooks also brings claims for two events that occurred after the September 2016 Determination: a denied promotion and the assignment of several underperforming direct reports to sabotage Ms. Brooks' performance.  Both acts are attributable to Wanda Henderson.  Ms. Brooks can already bring an internal complaint claim based on Ms. Henderson's decision to demote her in April 2016, as discussed above.  Ms. Brooks can similarly bring claims for the two later decisions because denied promotions go to the core of her Charge and sabotaging performance through supervisee assignments is akin to sabotage through account assignments.

The between-charge events for which Ms. Brooks can try to bring retaliation claims are as follows:

| Date | Event |
|------|-------|
| October 26, 2012 | Mr. Allen removed Ms. Brooks from the Downtown Locker Room account.[7]  (ECF No 14, ¶ 69). |
| December 12, 2012 | Mr. Allen reassigned Ms. Brooks to the worst performing territory in the Chesapeake District. (*Id.*, ¶¶ 73, 79). |
| January 1, 2013 | Ms. Brooks was the only one of her peers not to receive reassignments from Mr. Allen.  (*Id.*, ¶ 75). |
| January 10, 2013 | Mr. Allen reassigned declining accounts to Ms. Brooks' direct reports.  (*Id.*, ¶ 80). |
| January 23, 2013 | Mr. Allen reassigned another declining account to Ms. Brooks.  (*Id.*, ¶ 83). |

---

[7] As UPS notes, (ECF No. 15-1, at 10 n.7), the amended complaint is not clear whether Ms. Brooks was removed from the account before or after filing her EEOC Charge.  Ms. Brooks exhausted the retaliation claim for this event if it occurred after her Charge.  Whether Ms. Brooks successfully exhausted any claims if she was removed before the Charge is discussed below.

| Date | Event |
|---|---|
| May 17, 2013 | Mr. Allen removed Ms. Brooks from the "Ready Now" list and moved her to the "Rotation 3-5 Years" list. (*Id.*, ¶ 85). |
| July 2013 | Mr. Allen was replaced as Director of Sales for the southern Chesapeake District by a white man named Matt Ford. (*Id.*, ¶¶ 89-90). |
| October 22, 2013 | Thomas White, Managing Director of Sales for the Chesapeake District, announced another large account was being reassigned from Ms. Brooks. (*Id.*, ¶ 91). |
| June 6, 2014 | Joe Olejniczak, the new Managing Director of Sales for the Chesapeake District rescinded Mr. Ford's decision to place Ms. Brooks on the "Rotation in 1-2 Years" list and returned her to the "Rotation 3-5 Years." (*Id.*, ¶¶ 93-94). |
| 2014 | Jeff Briggs, a white man, was promoted to the Director of Sales position for the northern Chesapeake District. (*Id.*, ¶ 100). |
| April 2015 | A white woman received an International Manager for Public Affairs position for which Ms. Brooks also applied. (*Id.*, ¶ 101). |
| June 2015 | Matt Ford was replaced as Director of Sales for the southern Chesapeake District by Wanda Henderson, an African American woman. (*Id.*, ¶ 102). |
| Early 2016 | Three less senior white men were promoted to Division Manager positions. (*Id.*, ¶ 105). |
| 2016 | A white man received an Enterprise Account Manager position for which Ms. Brooks applied. Ms. Brooks was also denied a public affairs role. (*Id.*, ¶ 107). |
| April 30, 2016 | Ms. Brooks was demoted in grade and salary to an essentially non-existent position by Wanda Henderson. (*Id.*, ¶¶ 104, 106). |
| December 1, 2016 | Ms. Brooks was notified by Ms. Henderson a white woman was selected for another public affairs position. (*Id.*, ¶ 109). |
| December 2, 2016 | Ms. Henderson returned Ms. Brooks to an Area Sales Manager role. Five of the six direct reports Ms. Brooks received were "underperforming or on performance improvement plans[.]" (*Id.*, ¶ 110). |

UPS's motion to dismiss the above retaliation claims on timeliness and exhaustion grounds will be denied. UPS's motion to dismiss on timeliness grounds all discrimination claims after the 2012 Charge and before the limitations period for the 2018 Charge

28

(Paragraphs 73, 75, 80, 83, 85-86, 89-90, 91, 93-95, 100-02, 105-107, 109-10) will be granted.[8]

### 2. Certain Timely Claims

UPS also argues that three of Ms. Brooks' otherwise timely claims were not exhausted in her two charges.  UPS first argues that any claims based on the reassignment of Ms. Brooks' Downtown Locker Room account (assuming this occurred before her 2012 Charge) were not exhausted because the 2012 Charge did not mention account reassignments.  (ECF No. 15-1, at 10 n.7).  Ms. Brooks can bring the Downtown Locker Room claims, particularly because Mr. Allen made the decision, as discussed above.

UPS next argues that two claims were not exhausted in Ms. Brooks' 2018 Charge because they were "not mentioned or raised[.]" (ECF No. 15-1, at 12).  The claims are that: (1) in June 2017, a different African American woman was selected as the best diversity candidate for promotion in the Chesapeake District during a "People's Meeting," and (2) in January 2018, at least three of Ms. Brooks' white peers and subordinates received promotions and lateral transfers and she did not.  (ECF No. 14, ¶¶ 113, 118).  Ms. Brooks can bring both claims.  Her 2018 Charge alleges that her superiors were not putting her up for promotions at "People's

---

[8]   Ms. Brooks' discrimination claim grounded in the reassignment of her Downtown Locker Room account, (ECF No. 14, ¶ 69), can continue only to the extent the account was reassigned before her 2012 Charge.

Meetings," including one meeting in May 2017.  (ECF No. 15-6, ¶¶ 12, 14-15, 18-20).  The Charge also alleges Ms. Brooks' peers were being advanced, including in January 2018, while Ms. Brooks' career stagnated because of race and sex discrimination.  (*Id.*, ¶¶ 2, 27, 30).  UPS was on notice to claims arising from any People's Meetings in and around May 2017 and to promotions of peers outside her protected group in and around January 2018.

UPS's motion to dismiss on exhaustion grounds Title VII claims centered on these three events will also be denied.

### E.   Section 1981 Timeliness

Section 1981 employment discrimination claims are governed by a four-year statute of limitations that runs from when the alleged injuries occurred.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004); *see* 28 U.S.C. § 1658(a).  UPS argues that this bars Ms. Brooks' Section 1981 claims occurring before July 5, 2014, after accounting for the parties' tolling agreement.  (ECF No. 15-1, at 7-9).  Once again, UPS fails to identify any remaining claims that are clearly untimely.  It points to two possible events: (1) Jeff Briggs, a white man, was promoted to Director of Sales for the Chesapeake District, North, and (2) three white men were promoted to Division Manager positions.  (ECF No. 15-5, at 8; *see* ECF No. 14, ¶¶ 100, 105).  UPS relies on employment records that cannot be considered at the motion to dismiss stage, as discussed above.  The amended complaint states only that the events occurred

"[i]n 2014" and "early 2016," respectively.  (ECF No. 14, ¶¶ 100,
105).  Because "the face of the complaint" does not advance claims
based on events occurring before July 5, 2014, *see Semenova v. Md.
Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017), UPS's motion to
dismiss these claims on timeliness grounds will be denied.

   **F.   Failure to State a Claim**

   Ms. Brooks' remaining claims arise under Title VII only, under
Section 1981 only, and under both statutes.  UPS argues that Ms.
Brooks failed to state many of these claims.  All of UPS's
arguments are analyzed together because Title VII and Section 1981
share the same pertinent pleading standards.  *See Love-Lane v.
Martin*, 355 F.3d 766, 786 (4th Cir. 2004); *Jenkins v. Gaylord Ent.
Co.*, 840 F.Supp.2d 873, 880 (D.Md. 2012).  *But see Comcast Corp.
v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009,
1017-19 (2020) (holding that Section 1981 plaintiffs must plead
but for causation and cannot rely on motivating factor causation
as under Title VII).  Discrimination claims are discussed first,
and then retaliation claims.  Ms. Brooks' claims will not be
dismissed for abandonment, even though she does not respond to
UPS's arguments.

   **1.  Discrimination**

   Title VII prohibits discrimination "against any individual
with respect to [her] compensation, terms, conditions, or
privileges of employment because of such individual's race, color,

religion, sex, or national origin[.]"  42 U.S.C. 2000e-2(a)(1).
Section 1981 provides that all people shall enjoy "the same right
. . . to make and enforce contracts[.]"  42 U.S.C. § 1981.  Ms.
Brooks appears to plead at least two forms of discrimination:
(1) disparate treatment, and (2) failure to promote.

"[T]o determine what the plaintiff must plausibly allege at
the outset of a lawsuit, we usually ask what [elements] the
plaintiff must prove in the trial at its end." *Comcast Corp.*, 140
S.Ct. at 1014.  In employment discrimination cases, a plaintiff
must plead that (1) her employer took an adverse employment action
against her, (2) because of her protected status.  *See* 42 U.S.C.
2000e-2(a)(1); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d
582, 585 (4th Cir. 2015).  "An employment discrimination plaintiff
need not plead a prima facie case of discrimination to survive a
motion to dismiss because the prima facie case is an evidentiary
standard, not a pleading standard." *McCleary-Evans*, 780 F.3d at
584 (cleaned up) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S.
506, 510, 515 (2002)).

UPS challenges both elements of Ms. Brooks' discrimination
claims, arguing she: (1) failed to allege an adverse employment
action, and (2) failed to allege that UPS acted because of Ms.
Brooks' race or gender.

**a)   Failure to Allege an Adverse Employment Action**

To qualify as an adverse employment action, a discriminatory act must result in "a significant change in employment status," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), by "adversely affect[ing] the terms, conditions, or benefits of the plaintiff's employment," *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).   UPS argues that Ms. Brooks' allegation in Paragraph 120 that Wanda Henderson told her "that she was going to transition her to a Business Management Position," which Ms. Brooks considered a demotion, is not an adverse action because it never came to fruition.   (ECF Nos. 14, ¶ 120; 15-1, at 14 & n.12).   UPS has the better argument.   Merely threatening a demotion is not an adverse employment action in an employment discrimination claim.   *Bell v. McDonald*, 14-cv-0188, 2016 WL 7441674, at *10 (M.D.N.C. Dec. 27, 2016).   UPS's motion to dismiss Ms. Brooks' discrimination claim in Paragraph 120 will be granted.

**b)   Failure to Allege a Plausible Connection to Race or Gender**

To allege that an employer acted "because of" an employee's protected status, there must be "some connective thread between the alleged mistreatment and the protected status."   *See Gough v. Rock Creek Sports Club*, No. 19-cv-3533-PJM, 2021 WL 795447, at *2 (D.Md. Mar. 2, 2021).   Although "a plaintiff is not required to identify" comparators, that is one way to satisfy Rule 8's pleading requirements.   *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F.App'x

745, 748 (4th Cir. 2017) (unpublished) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545–46 (4th Cir. 2003)).   For disparate treatment claims, allegations that similarly situated employees outside the plaintiff's protected class were treated differently can support an inference that the employer acted because of the plaintiff's protected status.   *See id.*   For failure to promote claims, allegations that a plaintiff was rejected for a position in favor of a less qualified candidate from outside her protected class can support an inference that the employer acted because of the plaintiff's protected status.   *See Tickles v. Johnson*, 805 F.App'x 204, 208 (4th Cir. 2020).

UPS argues that the allegations in Paragraphs 52 and 59-60 fail to state claims for discrimination because "one comparator [is] of the same gender and two of the four comparators had no race identified."[9]   (ECF No. 15-1, at 14).   Ms. Brooks alleges that she received negative "makeshift" reviews and was denied an annual raise and merit bonus in April 2012.   (ECF No. 14, ¶¶ 52, 59).   She further alleges that she had never been denied an annual raise, that Mr. Allen's other reports received raises (including one white woman, one white man, and two men whose race is not explicitly

---

[9] In its reply, UPS refers in one place to Paragraphs 59-60 and in another to Paragraphs 56-58.   (ECF No. 21, at 3, 5).   UPS's argument is construed to apply to Paragraph 59-60 because it elsewhere concedes that Ms. Brooks states a discrimination claim in Paragraphs 56-58.   (ECF No. 15-4, at 1).

identified), and that she'd out-performed "each similarly-situated Caucasian manager[.]"  (*Id.*, ¶¶ 34, 59-60, 104).

Ms. Brooks successfully states a claim at Paragraphs 52 and 59-60.  UPS misconstrues Ms. Brooks' amended complaint, which implies that all the comparators are white.  Further, Ms. Brooks may be entitled to bring a sex discrimination claim based on her combined identity as an African American woman.  *See Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 226 n.9 (4th Cir. 2016) (citing *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994)).  Favorable treatment for a white woman does not necessarily defeat her claim.  UPS also already concedes that there are sufficient allegations to support a race and gender discrimination claim for UPS's failure to promote her to Enterprise Director in February 2012, a decision made close in time and involving the same person (Sheldon Allen).  (ECF Nos. 14, ¶¶ 54, 56-58; 15-4, at 1).  UPS's motion to dismiss Ms. Brooks' discrimination claim in Paragraphs 52 and 59-60 will be denied.

UPS argues that Paragraphs 106 and 110 offer "no articulated connection to race[.]"  (ECF No. 15-1, at 14).  Ms. Brooks alleges that she was "demoted in grade and salary" by Wanda Henderson in April 2016 and, when she was later restored to her higher position, she was assigned more underperforming employees than other sales managers.  (ECF No. 14, ¶¶ 106, 110).  UPS's arguments ignore that it concedes that Ms. Brooks can state claims for denied promotions

and transfers within as little as one month of her demotion and restoration. Ms. Brooks attributed at least one of those denials to Ms. Henderson. (*See* ECF Nos. 14, ¶ 107, 109; 15-4, at 3-4). At this early stage in the litigation, UPS's motion to dismiss will be denied.

UPS argues Paragraphs 102 and 113 fail to state claims for discrimination because "the individual [Ms. Brooks] claims was treated better than her is of the same race" and gender. (ECF Nos. 15-1, at 14; 21, at 4 n.3). Ms. Brooks alleges that "a less experienced, less qualified African American female was advanced as the best diversity candidate in the Chesapeake District," (ECF No. 14, ¶ 113), and that an African American woman was promoted to Director of Sales "even though she was not performing as well as Ms. Brooks," (*Id.*, ¶ 102). Ms. Brooks' claims fail. Although UPS is wrong in its view that a comparator of the same race and gender necessarily defeats a claim, it certainly does not support an inference of discrimination and likely undermines it. Here, though, no inference of discrimination is possible because Ms. Brooks does not allege facts other than those about the comparators. She does not even identify who the decision-makers were and without at least that, the fact that other close-in-time discrimination claims are going forward cannot save these claims. UPS's motion to dismiss Ms. Brooks' bald discrimination claims in Paragraphs 102 and 113 will be granted.

####    2.    Retaliation

Title VII and Section 1981 make it unlawful for "an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see Love-Lane*, 355 F.3d at 786.   To state a retaliation claim, a plaintiff must allege facts rendering it plausible that (1) her employer took an adverse action against her (2) because of her opposition to, or participation in proceedings about, unlawful employment practices. *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187 (4th Cir. 2010).   As in discrimination cases, plaintiffs need not plead a *prima facie* case to state a retaliation claim. *See McCleary-Evans*, 780 F.3d at 584.

UPS challenges Ms. Brooks' retaliation claims on two grounds: (1) failure to allege an adverse action, and (2) failure to allege that her protected activity caused the adverse actions.

####    a)    Failure to Allege an Adverse Action

In the retaliation context, adverse actions need only be "materially adverse[.]" *Forgus v.* Mattis, 753 F.App'x 150, 154 (4th Cir. 2018) (unpublished) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)).   It is only necessary that a purported adverse action "well might" be enough "to

37

dissuade[ ] a reasonable worker from making or supporting a charge of discrimination[.]" *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016) (alteration in original) (internal quotation omitted).

UPS argues that Paragraph 75's allegation that "all of Ms. Brooks' peers were given reassignments by Mr. Allen except for Ms. Brooks" fails because it does not allege a materially adverse action. (ECF No. 15-1, at 12 n.9). It is not evident from the face of the term "reassignment" that not receiving one would dissuade an employee from making complaints. Because Ms. Brooks alleges nothing more, UPS's motion to dismiss her retaliation claim in Paragraph 75 will be granted.

UPS argues that Paragraphs 85 and 86, regarding Mr. Allen's decision to remove Ms. Brooks from the "Ready Now" list and place her instead on the "Rotation 3-5 Years" list, fail similarly. (ECF No. 15-1, at 12 n.9). Here Ms. Brooks successfully states a claim. She alleges that the change amounted to a demotion, (ECF No. 14, ¶ 85), and her amended complaint relies heavily on the premise that being placed on the "Ready Now" list made an employee a candidate for certain division- and director-level positions and created opportunities to meet with senior leaders, (*see, e.g., id.*, ¶¶ 18, 21, 27, 46). A reasonable worker might be dissuaded from complaining if she lost the opportunity to advance into higher

and better paying positions.  UPS's motion to dismiss Ms. Brooks' retaliation claim in Paragraphs 85 and 86 will be denied.

UPS again argues that the allegations in Paragraph 120, describing Ms. Henderson's statement that Ms. Brooks would be transitioned to Business Manager is insufficient because it never came to fruition.  (ECF No. 15-1, at 14 & n.12).  Contrary to a discrimination claim, threatening a demotion can constitute a materially adverse action for a retaliation claim.  *See Maron v. Va. Polytechnic Inst. & State Univ.*, 508 F.App'x 226, 230-31 (4th Cir. 2013) (unpublished) (threatening termination); *Scannell v. Bel Air Police Dep't*, 968 F.Supp. 1059, 1065-66 (D.Md. 1997) (threatening reassignment).  UPS's motion to dismiss Ms. Brooks' retaliation claim in Paragraph 120 will be denied.

### b)   Failure to Allege that Protected Activity Caused the Adverse Actions

Most commonly, a plaintiff can support an inference of causation by alleging that "the adverse action bears sufficient temporal proximity to the protected activity[.]" *Tutt v. Wormuth*, No. 19-2480, 2021 WL 4076729, at *2 (4th Cir. Sept. 8, 2021) (unpublished) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, (2001)).  Where temporal proximity is the only evidence of causation, however, "the temporal proximity must be very close." *Clark Cnty.*, 532 U.S. at 273.  A lapse of three-to-four months between the protected activity and the alleged retaliation "is too long to establish a causal connection by

39

temporal proximity alone." *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (unpublished) (per curiam); *cf. Brockman v. Snow*, 217 F.App'x 201, 207 (4th Cir. 2007) (unpublished) (three months "is sufficiently proximate to satisfy the requirement").  Of course, a plaintiff can point to more than temporal proximity, including direct evidence of retaliatory animus or "evidence of recurring" retaliatory conduct in the intervening period. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).  And, in any case, a plaintiff must also allege that the relevant decisionmaker knew about her protected activity. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *Evans v. Md. State Highway Admin.*, No. 18-cv-0935-JKB, 2018 WL 4733159, at *8 (D.Md. Oct. 2, 2018) (unpublished) (internal citation omitted).

UPS argues that the allegations in Paragraphs 89 and 90 fail because "the timing of these actions" is too far removed from the 2012 EEOC Charge. (ECF No. 15-1, at 13 n.10).  Ms. Brooks alleges that UPS replaced Mr. Allen as Director of Sales without interviewing her in July 2013, nine months after Ms. Brooks filed her Charge. (ECF No. 14, ¶¶ 89-90).  But Ms. Brooks also alleges that Mr. Allen told her that her career had been put on hold because she complained to the EEOC. (ECF No. 14, ¶ 74).  She further alleges that Mr. Allen retaliated against her nearly continuously in the months after she filed her complaint. (*Id.*,

40

¶¶ 69, 73, 78-80, 83, 85)).   And, she alleges Mr. Allen sand-bagged her attempts to apply for the Enterprise Director position in early 2012.   (*Id.*, ¶¶ 53-58).   Taken together, the direct evidence of animus and pattern of similar conduct are sufficient to overcome the gap in time.   The degree to which Mr. Allen in fact had control over the selection of his replacement can be developed in discovery.   UPS's motion to dismiss Ms. Brooks' retaliation claim in Paragraphs 89 and 90 will be denied.

UPS argues that three claims that occurred relatively close in time to protected activity are conclusory.   (ECF No. 15-1, at 13 n.10, 15).   In Paragraph 91, Ms. Brooks alleges that Thomas White removed her from a large account in October 2013.   (ECF No. 14, ¶ 91).   She had complained internally to HR four months prior, in June.   (*Id.*, ¶ 88).   In Paragraphs 93-95, Ms. Brooks alleges that Joe Olejniczak demoted her from "Rotation 1-2 Years" to "Rotation 3-5 Years" in April 2014.   (*Id.*, ¶ 93-95).   She had met with HR to discuss her complaints, including her "Ready Now" status, three-to-four months prior, in December 2013.   (*Id.*, ¶ 92). In Paragraph 113, Ms. Brooks alleges that she was not advanced as the best diversity candidate on June 27, 2017, less than one month after complaining about discrimination in an internal Business Compliance and Ethics Questionnaire.   (*Id.*, ¶¶ 112-13).

Even though the alleged retaliatory conduct was close-in-time to potential protected activity, Ms. Brooks fails to state a claim

because she does not allege enough to support an inference that any decision-makers knew about her internal complaints. Indeed, she does not include any information about who made the decision not to put her forward as the best diversity candidate. This same logic extends to any claims rooted in Ms. Brooks filing her 2012 Charge. UPS's motion to dismiss Ms. Brooks' retaliation claims in Paragraphs 91, 93-95, and 113 will be granted.

Last, UPS challenges Paragraphs 101-02, 105-07, and 109-10. (ECF Nos. 15-1, at 15; 21, at 3 n.2). These claims occurred between June 2015 and December 2016. (ECF No. 14, at 25-27). All include the bald statement that the action "was taken in retaliation for the filing of Ms. Brooks' 2012 EEOC Charge and her complaints about discrimination and retaliation to UPS management." (*Id.*). For Paragraphs 101-02, 105, and 107, no specific decision maker is identified. Wanda Henderson is responsible for the conduct in Paragraphs 106 and 109-10, but none of these claims occurred within three months of any possible protected activity.[10] UPS's motion to dismiss retaliation claims alleged in Paragraphs 101-02, 105-07, and 109-10 will be granted.

---

[10] The demotion in Paragraph 106 can be attributed to Wanda Henderson even though she is not named in that paragraph. She was Ms. Brooks' direct supervisor at the time and she later reinstated Ms. Brooks to her position. (ECF No. 14, ¶¶ 102, 110).

42

**IV.  Motion to Strike**

UPS also moves to strike six paragraphs from Ms. Brooks'
amended complaint.  (ECF No. 15-1, at 16).  There, Ms. Brooks
alleges that she was subjected to racial slurs, including the n-
word, and other racist and sexist comments in the late 1990s.  (ECF
No. 14, ¶¶ 11-16).  She complained internally and her direct
supervisor was later terminated, although it is not clear if this
resulted from Ms. Brooks' complaint.  (*Id.*).  Outside these six
paragraphs, Ms. Brooks alleges she was later placed on the "Ready
Now" list at least in part because "UPS was taking steps to remedy
the lack of female and African-American" promotion candidates.
(*Id.*, ¶ 18).  Because UPS is wrong to argue that the allegations
"serve no purpose other than to inflame and unfairly prejudice,"
(ECF No. 15-1, at 16), they will remain, as discussed below.

Courts have discretion to strike from a pleading "any
redundant, immaterial, impertinent, or scandalous matter."
Fed.R.Civ.P. 12(f).  "Rule 12(f) motions are generally viewed with
disfavor because striking a portion of a pleading is a drastic
remedy and because it is often sought by the movant simply as a
dilatory tactic."  *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d
316, 347 (4th Cir. 2001) (internal quotation omitted).  Thus,
"[w]hen reviewing a motion to strike, the court must view the
pleading under attack in a light most favorable to the pleader."
*Kantsevoy v. LumenR LLC*, 301 F.Supp.3d 577, 611 (D.Md. 2018)

43

(citations and quotations omitted).  Any doubt about whether the material is irrelevant or prejudicial "should be resolved in favor of the non-moving party."  5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3$^d$ ed. 2021).

Rule 12(f) motions "will be denied unless the matter under challenge has no possible relation to the controversy and may prejudice the other party." *United States ex rel. Ackley v. Int'l Bus. Machs. Corp.*, 110 F.Supp.2d 395, 406 (D.Md. 2000) (internal quotations and citations omitted).  Although the events Ms. Brooks recounts may not be closely connected to her claims, it can hardly be said that they have no possible relation to the controversy. At a minimum, the allegations may be relevant to whether Ms. Brooks had a reputation within UPS for filing internal complaints about workplace racism and sexism.  Even if UPS can show that prejudice may result, it cannot satisfy the requirements to have Ms. Brooks' allegations struck.  UPS's motion to strike will be denied.

## V.   Conclusion

For the foregoing reasons, UPS's partial motion to dismiss will be granted in part and denied in part and its motion to strike will be denied.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
